Allen A. NIMETZ, et al., Appellant,

v.

Peter J. CAPPADONA, et al., Appellee.

No. 90–1025.

District of Columbia Court of Appeals.

Argued May 24, 1991.
Decided Sept. 17, 1991.

Walter J. Murphy, Jr. with whom William J. Carter, Washington, D.C., was on the brief, for appellant.

Barry J. Nace, with whom Irving R.M. Panzer, Washington, D.C., was on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and FARRELL, Associate Judges.

ROGERS, Chief Judge:

Appellants Allen Nimetz, M.D., and the Washington Clinic (referred to collectively as "Dr. Nimetz") appeal from a judgment of medical malpractice in favor of appellees

Peter and Maureen Cappadona ("Mr. Cappadona"). The trial judge instructed the jury that it could find Dr. Nimetz liable on any of six different theories of negligence, including a theory to which Dr. Nimetz had objected as being unsupported by the evidence. Conceding that there was sufficient evidence for the jury to find negligence on the five other theories, Dr. Nimetz renews his contention on appeal that the judge erred in submitting the remaining theory to the jury since Mr. Cappadona failed to present sufficient evidence to establish a breach of the standard of care. Dr. Nimetz opposed Mr. Cappadona's request for a special verdict form, and the trial judge decided to use a general verdict form. On appeal Dr. Nimetz contends that because the general verdict does not make clear whether the jury relied on the unsupported theory, the proper remedy is to remand for a new trial.

Although we agree that it was error to instruct the jury on the theory to which Dr. Nimetz objected, we affirm nonetheless. At the close of the evidence Mr. Cappadona requested, in order to avoid a later issue on appeal, that the jury be presented with a special verdict form requiring it to indicate whether it found negligence with regard to each of the theories of liability. Dr. Nimetz opposed this request, and we hold that he is therefore barred from raising on appeal the contention that the jury may have relied on the improper theory.

## I.

Peter Cappadona was admitted to Suburban Hospital in Bethesda, Maryland on April 26, 1986, after he had suffered a relatively mild heart attack. Dr. Nimetz, a cardiologist, became the primary physician and ordered that Streptokinase (a drug to reduce blood clots) be administered. Shortly after the drug was administered, Mr. Cappadona began to experience unusual symptoms, including coughing, tightness in the neck, a flushed face, and trouble breathing. Dr. Nimetz ordered that Benadryl be administered, and that a catheterization procedure be performed. During the catheterization another dose of Strep-

tokinase was administered. Mr. Cappadona's condition did not improve, and later that night Dr. Nimetz learned that Mr. Cappadona had low blood pressure but very high cardiac output. Dr. Nimetz determined that this unusual phenomenon could have resulted from any of four different causes: an infection, an unusual reaction to the Streptokinase, a "vasodilatory phenomenon," or a vascular collapse. Dr. Nimetz ordered drug treatment for all four possible causes, but Mr. Cappadona did not improve. In the early morning hours, Dr. Nimetz left the hospital.

Later in the morning Dr. Nimetz prescribed a drug called "Levophed" in order to increase Mr. Cappadona's blood pressure. When there was no effect Dr. Nimetz ordered "massive doses" of the drug. Later still, because of persistent low blood pressure and high cardiac output, Dr. Nimetz inserted a "balloon pump" to increase the blood pressure to the lower extremities. Ultimately, Mr. Cappadona's right leg had to be amputated at the knee, a portion of his left foot was amputated, and 75 to 90 percent of his stomach was removed. The hospital bills totaled around $300,000.

At trial Mr. Cappadona maintained that Dr. Nimetz failed to meet the appropriate standard of care in six different ways: (1) administering the second dose of Streptokinase during the catheterization; (2) failing to consult with more qualified physicians; (3) failing to remain in the hospital on the night of April 26, 1986; (4) administering excessive amounts of Levophed; (5) inserting the "balloon pump;" and (6) failing to treat adequately the allergic reaction. During the discussion of the jury instructions, Dr. Nimetz objected to an instruction on negligent failure to consult. Mr. Cappadona thereafter requested that the jury be provided with a special verdict form on which the jury could specify, for each of the six theories, whether Dr. Nimetz had been negligent. Dr. Nimetz opposed the request, and the trial judge decided to submit a general verdict form. The jury returned a general verdict in favor of Mr.

.

Cappadona for $2.5 million.[1]

## II.

On appeal Dr. Nimetz properly concedes that Mr. Cappadona presented sufficient evidence to support five of the six theories of negligence.[2] He focuses on the trial judge's decision to instruct the jury on the "failure to consult" theory, which Dr. Nimetz maintains was not supported by substantial evidence.

### A.

■■ A party is entitled to an instruction on his or her theory of the case if the instruction is supported by the evidence. *District of Columbia v. Peters,* 527 A.2d 1269, 1274 n. 4 (D.C.1987). Dr. Nimetz challenges the instruction to the jury that they could find him negligent because he "fail[ed] to consult with more qualified physicians when faced with a situation that was unknown to him." [3] Mr. Cappadona concedes that none of his several expert witnesses expressed an opinion on whether Dr. Nimetz's failure to consult with other doctors breached the standard of care. According to Mr. Cappadona, the "failure to consult" instruction was supported by the testimony of Dr. Nimetz himself:

> Q. (counsel for Mr. Cappadona) And isn't it standard practice, sir, that when you have a situation that is something that you haven't seen before, you call someone else in?
>
> A. (Dr. Nimetz) I believe there were over 25 physicians involved in Mr. Cappa-

dona's care and we did consult other people, yes.

Q. Who did you call in at 1:00 in the morning, sir?

A. One o'clock in the morning, I felt that consultation with the house staff available and myself was what was necessary and felt confident in handling the matter myself.

Q. The house staff consisted of the Resident Kalan and first year Resident Kurtz, is that true?

A. That is correct.

Q. And you certainly didn't expect that they knew more than you did, did you?

A. I was the captain of the ship. I did not expect anymore than I did, but I am certainly humble enough to listen to any suggestion wherever they come from.

Q. And you didn't call anybody else in to help you out with a situation that you hadn't seen previously?

A. No one else was called in at this point because I did not think there was anyone else who was going to be able to offer more at that time.

. . . . .

Q. Now, you indicated also that the next morning there were rounds that were being conducted, correct?

A. The house staff generally makes rounds daily, yes.

Q. And this serious problem that no one has ever seen according to you before in a situation, any of these house staff, the great people that were coming through that you could consult with make any

---

1. The jury awarded $2 million to Peter Cappadona, and $500,000 to Maureen Cappadona.

2. Dr. Nimetz's concession is well-taken. The record reflects that the expert testimony was ample for the jury to conclude that Dr. Nimetz's treatment was inconsistent with the standard of care. *See* testimony of Dr. Morton J. Kern (it was a breach of the standard of care to give the second dose of streptokinase); testimony of Dr. Harold J. Swan (a doctor has an obligation to remain at the hospital with a critically ill patient); *id.* (the doses of Levophed were excessive); testimony of Dr. John D. Palmer (it was beneath the standard of care to use the balloon pump); testimony of Dr. Kern (Dr. Nimetz's failure to treat the allergic reaction with epinephrine was a breach of the standard of care).

3. The trial judge instructed the jury:

   Once you have determined the appropriate standard, then the next thing you must do is to decide whether Plaintiffs have proven by a preponderance of the evidence that Dr. Nimetz failed to meet that standard. In that connection, Plaintiffs have claimed that Defendant was negligent, that he failed to meet that standard, in other words, in the following ways:

   . . . . .

   Second, by failing to consult with more qualified physicians when faced with a situation that was unknown to him;

   . . . . .

notes about what happened here, about your consultation?

A. *There was no formal consultation on that day.* [Emphasis added].

The most this testimony demonstrates, however, is that Dr. Nimetz failed to consult with a more knowledgeable doctor during the crisis period. There was no evidence at trial that the lack of such consultation constituted a breach of the appropriate standard of care. In the absence of such evidence, the jury could only speculate that Dr. Nimetz's consultation or lack thereof was negligent. *See Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988) ("a plaintiff is required to put on expert testimony where the subject presented is 'so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson'") (quoting *District of Columbia v. Peters, supra,* 527 A.2d at 1273).[4] Therefore, the judge erred in giving the instruction on "failure to consult."

### B.

When a jury, after being instructed on alternative theories of liability, returns a general verdict in favor of the plaintiff, and on appeal it is determined that one of the theories was not supported by substantial evidence, the court will generally remand for a new trial. *See District of Columbia v. White,* 442 A.2d 159, 165 (D.C.1982) ("[w]here there are several theories of liability, one of which is impermissible, and the court 'cannot determine on which theory of liability the jury relied when finding in favor of the [plaintiff], leaving open the possibility that it may have relied on the impermissible one, the case must be remanded for retrial'") (quoting *Murphy v. United States,* 209 U.S.App. D.C. 382, 391, 653 F.2d 637, 646 (1981)).

In this case, however, counsel for Mr. Cappadona made an effort to eliminate the uncertainty inherent in a general verdict. At the close of all the evidence, Mr. Cappadona's counsel requested that the jury be given a special verdict form requiring it to indicate separately whether it found negligence under each of the six theories. Counsel for Dr. Nimetz opposed the request, arguing that "the jury can perfectly well say in one finding, did Dr. Nimitz [sic] adhere to the standard of care or didn't he." The trial judge asked counsel for Mr. Cappadona why he wanted the special verdict form, and counsel responded:

> Your Honor, there are a lot of issues in this case and I think that we should be in a position of knowing exactly what it is the jury believes and accepts or that they don't accept, and some of these I think are—are pretty—could form a basis at some point down the road for an appellate issue if we don't have all of these answers provided by the jury....

The judge, in the exercise of her discretion, *see* Super.Ct.Civ.R. 49 (1990), decided to use a general verdict form, requiring the jury to make separate findings only on negligence, proximate cause, and the award of damages for each plaintiff. Thus, in this case the defendant is relying on appeal on the very uncertainty he helped to foster.

The court has not heretofore held that a defendant who fails to request a special verdict will be barred on appeal from complaining about the uncertainty of the verdict. Recently, in *District of Columbia v. Bethel,* 567 A.2d 1331, 1335 (D.C.1990), the court indicated that the question was still open whether a defendant waives the right to challenge a jury verdict by failing to "request that the trial judge proceed by special verdict or interrogatories to the jury, [or to] take any other steps in the

---

**4.** Mr. Cappadona argues on appeal that "there is a duty by law, clear common sense and medical standards to consult on an issue that is above a particular physician's ken." The court has made clear, however, that "[t]he standard of care in medical malpractice cases must ordinarily be proven by expert testimony." *Meek v. Shepard,* 484 A.2d 579, 581 n. 4 (D.C.1984). In

the instant case, the average layperson, even after applying "common sense," would not be equipped to decide whether Dr. Nimetz's failure to consult during the crisis period deviated from the "course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Id.* at 581.

trial court to avoid the problem of which" it complains on appeal. Other jurisdictions require a defendant to request a special verdict form in order to preserve the issue on appeal. *See, e.g., McCord v. Maguire,* 873 F.2d 1271, 1274 (9th Cir.1989) ("[the defendant] contends that the jury may have based its verdict solely on the ... unsubstantiated factual theories, [but the defendant's] failure to request a special verdict as to each factual theory in the case prevents him from pressing this argument on appeal") (footnote omitted); *Reese v. Cradit,* 12 Ariz.App. 233, 238, 469 P.2d 467, 472 (1970) (general verdict based on alternative theories will be sustained "in the absence of a request for an instruction that the jury bring in a separate verdict on each count") (quotation omitted); *Codekas v. Dyna–Lift Co.,* 48 Cal.App.3d 20, 25, 121 Cal.Rptr. 121, 124 (1975) ("a losing party should not be permitted to drag litigation through the appellate courts by turning his back on safeguards afforded by the Legislature; ... the responsibility for requesting special verdict forms rests with the party who loses the verdict (the appellant)"); *Colonial Stores, Inc. v. Scarborough,* 355 So.2d 1181, 1185–86 (Fla.1978) ("petitioners failed to request a special verdict as to each count.... [R]eversal is improper," adopting "two issue" rule as "the better view"); *Moore v. Jewel Tea Co.,* 46 Ill.2d 288, 294, 263 N.E.2d 103, 106 (1970) ("had [the] defendants desired to ascertain upon which count or counts the jury returned its verdicts, they could have done so by submitting a separate form of verdict as to each count. Not having done so, they cannot complain or seek to take advantage of their failure.") (citation omitted); *Morgan v. Washington Trust Co.,* 105 R.I. 13, 19, 249 A.2d 48, 52 (1969) ("there was no request by defendant ... that the jury make any special finding as to plaintiff's specific allegations of negligence.... It is well settled that where the verdict is general under circumstances such as are present here, that verdict must be allowed to stand."); *Anderson v. West,* 270 S.C. 184, 189, 241 S.E.2d 551, 554 (1978) ("[w]hen there are several [theories] in the case ... in the absence of an objection to

the verdict not having passed upon the several issues separately, [the verdict] will be held to have concluded all the issues") (quoting *Hussman Refrigerator & Supply Company v. Cash & Carry Grocer, Inc.,* 134 S.C. 191, 196, 132 S.E. 173, 174 (1926)); *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593, 607 (1983) (following majority "two issue" rule, observing that "any supposed unfairness to the defendants ... is cured by an additional corollary: that a defendant may submit a special interrogatory or verdict to require the jury to state its finding as to each theory"), *cert. denied,* 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984). *But see, e.g., Whinston v. Kaiser Foundation Hosp.,* 309 Or. 350, 358, 788 P.2d 428, 433 (1990) (declining to adopt the "two issue" rule in view of longstanding precedent).

The rationale for the estoppel rule was clearly stated by the United States Court of Appeals for the Ninth Circuit:

> Litigants like [the defendant] who wish to challenge the sufficiency of the evidence as to some, but not all, specifications of negligence must present an appropriate record for review by asking the jury to make separate factual determinations as to each specification. Any other rule would unnecessarily jeopardize jury verdicts that are otherwise fully supported by the record on the mere theoretical possibility that the jury based its decision on unsupported specifications. We will not allow litigants to play procedural brinkmanship with the jury system and take advantage of uncertainties they could well have avoided.

*McCord v. Maguire, supra,* 873 F.2d at 1274.

From the perspective of the most efficient use of the judicial system, it would clearly have been preferable for Dr. Nimetz's counsel to have acquiesced in (and the trial judge to have granted even over objection) Mr. Cappadona's counsel's request for a special verdict form. The trial took two weeks, the plaintiffs' claims, involving serious injuries, are supported by five of the six theories, plaintiffs' counsel acted to assure protection of any verdict

returned by the jury by requesting a special verdict form, and a new trial will result in delay and additional costs to the parties and the courts. Our courts are overburdened, and a plaintiff should not have to endure a second trial when the rules of procedure provide a remedy. As the court stated in *McCord v. Maguire, supra,* the litigants bear "the responsibility to request or submit special verdict forms." 873 F.2d at 1274 (citing *Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1374 (9th Cir.1987)).

The instant case thus demonstrates the wisdom of the estoppel rule.

We therefore adopt the rule that a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury.

### C.

■ The question remains whether to apply the estoppel rule retroactively. The Supreme Court has addressed the question of "the nonretroactive application of judicial decisions" in civil cases, and has focused on "three separate factors:"

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will fur-

ther or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice and hardship' by a holding of nonretroactivity."

*Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971) (citations omitted).[5]

Regarding the first *Chevron* factor for nonretroactivity, in adopting the estoppel rule we do not overrule clear past precedent. In *District of Columbia v. White, supra,* 442 A.2d 159, the court was not presented with a question involving the effect of failing to request a special verdict, and this court has not announced a rule on special verdicts. Indeed, even under the estoppel rule we announce today, when a defendant requests a special verdict or interrogatories, and the trial judge denies the request, the holding of *District of Columbia v. White* would still require reversal if on appeal the court concludes that one of the theories presented to the jury was improper.[6]

Thus, the question is whether the rule is a "clear break" from the past, a "newly minted principle," *O'Connell v. Maryland Steel Erectors, Inc.,* 495 A.2d 1134, 1138 (D.C.1985), or a rule that an attorney "should have known" was "about to be changed, because of either judicial or legislative intimations to that effect." *Mendes v. Johnson, supra* note 5, 389 A.2d at 790. We conclude that our decisions since *District of Columbia v. White* should have alerted counsel that the court was poised to adopt an estoppel rule.

---

5. This court has similarly defined the factors to be considered as "(1) the extent of the reliance of the parties on the old rule ...; (2) avoidance of altering vested contract or property rights; (3) the desire to reward plaintiffs who seek to initiate just changes in the law; and (4) the fear of burdening the administration of justice by disturbing decisions reached under the overruled precedent." *Mendes v. Johnson,* 389 A.2d 781, 789 (D.C.1978) (en banc).

6. *See Orr v. Crowder, supra,* 315 S.E.2d at 608 (we do not "imply that a trial judge is required to submit special interrogatories or verdicts to the jury on every case that involves multiple causes of action. ... It is only when a trial judge is specifically requested by the defendant to submit special findings and refuses to do so, and on appeal we conclude that one of the causes of action given to the jury is insufficient as a matter of law, that a reversal will occur.").

In the same year that the court decided *District of Columbia v. White*, the court decided *District of Columbia v. Jackson*, 451 A.2d 867 (D.C.1982), where the court said:

> it is not clear that the [general] verdicts included the full amount of the [medical bills paid by Medicaid].... As the party seeking a setoff, the District bears the burden of showing that the amount sought to be deducted is in fact part of the verdicts. The District should have met this burden by requesting either special verdicts (itemizing the types of damages awarded) or a special finding, accompanying each of the general verdicts, as to the medical expenses awarded. The jury should be instructed to make special findings whenever "the basis of the jury's determination cannot otherwise be ascertained and ... disclosure of the correct basis will be necessary to the proper consideration by the trial court of any motion addressed to the verdict and will, by the same token, be essential to adequate judicial review...."

*Id.* at 873–74 (citations and footnote omitted). Three years later, in *Sinai v. Polinger Co.*, 498 A.2d 520, 523 n. 1 (D.C.1985), the court stated, "[w]e do not rule out the possibility, in future cases, of requiring that a plaintiff make some showing of special prejudice before he [or she] will be permitted to challenge the verdict based on issues the jury may well never have reached, where the plaintiff ... failed to request that special interrogatories be submitted to the jury." Most recently in *District of Columbia v. Bethel, supra*, 567 A.2d at 1334, the court, responding to the citation to *District of Columbia v. White, supra*, 442 A.2d at 165–66, observed that, although it did not need to decide the estoppel issue, the defendant who on appeal was attacking the general verdict "did not request that the trial judge proceed by special verdict or interrogatories, nor ... take any other steps in the trial court to avoid the problem of which it now complains."[7]

Although the court suggested in *Sinai v. Polinger Co., supra*, that an estoppel rule would be a new rule, the cases on which it relied went no further than *District of Columbia v. White, supra*, holding simply that where there was a general verdict and claimed errors were "wrapped in the enigma of a general verdict," reversal was required. 498 A.2d at 523 n. 1 (quoting *E.L. Cheeney Co. v. Gates*, 346 F.2d 197, 200 (5th Cir.1965)). By contrast, post-*District of Columbia v. White* decisions—*District of Columbia v. Jackson, Sinai v. Polinger Co.*, and *District of Columbia v. Bethel*—focused on the special verdict issue and in some instances quite specifically stated that the defendant should request a special verdict, *see District of Columbia v. Jackson, supra*, 451 A.2d at 873–74, and in other instances suggested the direction in which the court would likely head. Thus, even if we now decide an issue of first impression, the court has, in effect, forecast its resolution. *Chevron, supra*, 404 U.S. at 97, 92 S.Ct. at 351; *see also O'Connell v. Maryland Steel Erectors, Inc., supra*, 495 A.2d at 1139 (*Chevron*'s "clear break principle" is a "threshold test" which must be met before an opinion is given nonretroactive effect).

The second factor—the "prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation"—also favors retroactive application. The special verdict rule, designed in part to prevent parties from "playing procedural brinkmanship with the jury system," *McCord v. Maguire, supra*, 873 F.2d at 1274, can be effective only if parties are on clear notice that the failure to ask for a special verdict has consequences on appeal. Although "[t]he general rule is that if an overruled decision deals with matters of procedure, the effect of a subsequent overruling decision is prospective only," *Mendes, supra* note 5, 389 A.2d at 789 n. 22, the court has acknowledged that the procedural-substantive classification is "least useful in determining the extent of retroactivity since the

---

7. In *District of Columbia v. Bethel*, the court did not need to reach the estoppel issue because it concluded that none of the plaintiff's theories was improperly presented to the jury. 567 A.2d at 1334.

distinction between substance and procedure is so malleable." *Id.* Obviously an estoppel rule has substantive effect; henceforth general verdicts will be upheld against challenges of insufficient evidence where a party requests a special verdict. On the other hand, to the extent that the rule is viewed as procedural, the plaintiffs here put the defendant, and the trial judge, on notice that the very reason they sought a special verdict was to avoid precisely the situation presented on this appeal, where the question of whether the jury relied on one of six theories of negligence which should not have been presented to it is "wrapped in an enigma of a general verdict [and] all must go back for another round." *E.L. Cheeney v. Gates, supra,* 346 F.2d at 200. Moreover, it is at least arguable that the estoppel rule was in place long before this trial. *See* WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2507 (1971) (discussing Fed.R.Civ.P. 49(a), and citing *L'Urbaine et la Seine v. Rodriquez,* 268 F.2d 1, 4 (5th Cir.1959) (when defendant objects to plaintiff's request for submission of special findings to jury, and no such findings are submitted to jury, the court held that under Rule 49(a) issues not requested by defendant are deemed found in support of judgment for plaintiff)); *Moore v. Moore,* 391 A.2d 762, 769 (D.C.1978) (where our rule of civil procedure is identical to federal rule, we look to federal authorities as persuasive).

Finally, equitable considerations persuade us to give the new rule retrospective effect. Although at the time of the trial, counsel for Dr. Nimetz had every right to object to the special verdict form, the reason he offered, while not exactly frivolous, did nothing to outweigh the benefits of having a special verdict form submitted to the jury where the defendant claimed one of six theories should not be presented to

the jury. Furthermore, counsel for Dr. Nimetz remarked that "the jury can perfectly well say in one finding, did Dr. Nimitz [sic] adhere to the standard of care or didn't he," thus suggesting either that counsel was willing to live with the general verdict, or that he was seeking to preserve an issue on appeal in the event the jury found for Mr. Cappadona. In view of Mr. Cappadona's effort to avoid a new trial on precisely the ground raised on appeal, it would be unfortunate, to say the least, to subject Mr. Cappadona to the prospect of a new trial when Dr. Nimetz has conceded liability under five of the six theories of negligence. Dr. Nimetz, moreover, has no basis on which to claim that it would work an "injustice to a party because of reliance on the continued validity of the prior legal rule ...," *Mendes, supra* note 5, 389 A.2d at 789, since there was no prior rule on special verdicts on which to rely.

Accordingly, we conclude that the estoppel rule is to be applied retroactively, and affirm the judgment.

FARRELL, Associate Judge, concurring:

I join the court's judgment and nearly all of its opinion and write separately only to point out what should be clear from our holding: that what remains of the rule of *District of Columbia v. White,* 442 A.2d 159 (D.C.1982), in this jurisdiction is essentially a formality. Henceforth *White* will apply only where the parties have urged a special verdict instruction but the trial judge, for reasons of his own, refuses to give it.[1] I have difficulty imagining that ever happening, but the prospect is so slight in any event that I think we have today repudiated *White.* Indeed, many of the decisions the court cites in support of the estoppel rule we adopt explicitly reject the rule of *White.*[2]

---

**1.** The court hypothesizes a situation where the *defendant* requests a special verdict but the judge refuses it, presumably on objection by the plaintiff. Instances where the defense and not the plaintiff would request a special verdict instruction seem to me so rare as to be nonexistent.

**2.** *E.g., Reese v. Cradit,* 12 Ariz.App. 233, 238, 469 P.2d 467, 472 (1970) (accepting as "better rule" principle that general verdict will stand if evidence on one count is sufficient to sustain verdict); *Moore v. Jewel Tea Co.,* 46 Ill.2d 288, 294, 263 N.E.2d 103, 106 (1970) (citing same rule as "settled law"); *Anderson v. West,* 270 S.C. 184, 187, 241 S.E.2d 551, 553 (1978) ("we hold that where a jury returns a general verdict involving

Nevertheless, I am not convinced we are acting outside our authority as a division by today's holding, and the result we reach is the right one. A party has it within his or her means—by requesting a special verdict—to insure that a finding of negligence rests upon a theory supported by the evidence, and absent such a request there is no unfairness in assuming that juries rest their conclusions on theories founded in the evidence. I also agree that *White's* demise, for all practical purposes, was fore-

cast—hence putting prudent attorneys on notice not to oppose a special verdict in these circumstances—by our decisions beginning with *District of Columbia v. Jackson,* 451 A.2d 867 (D.C.1982), discussed by the court *ante,* at 608–609.

---

two or more issues and its verdict is supported as to at least one issue, the verdict will not be

reversed"); *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593, 607 (1983).