Sarah LANDISE, Appellant,

v.

Thomas MAURO, Appellee.

No. 94–CV–173.

District of Columbia Court of Appeals.

Argued Dec. 18, 1996.
Decided Dec. 3, 1998.

**446**

John F. Karl, Jr., Washington, DC, for appellant.

Ferris Bond, Washington, DC, for appellee.

Before STEADMAN, RUIZ, Associate Judges, and KING, Senior Judge.*

RUIZ, Associate Judge:

Appellant, Sarah Landise, sued appellee, Thomas Mauro, alleging partnership in a law firm, and seeking damages for breach of an oral partnership agreement, conversion of partnership funds, breach of fiduciary duty and an accounting. Mauro's principal defense was that Landise's unauthorized practice of law barred her claim. The jury found that Landise and Mauro had not entered into an oral partnership agreement and that Landise had engaged in the unauthorized practice of law in the District of Columbia.

█ We hold that a partner's claim of partnership against a purported partner, if otherwise sustained by application of partnership law, is not precluded by the claimant's unauthorized practice. We also conclude that the trial court abused its discretion in excluding Mauro's statement admitting that Landise was entitled to share in the law firm's fees. This error, when viewed in the context of the weight of the evidence tending to show the existence of a partnership and possible jury confusion about the impact of Landise's unauthorized practice on her claim of

---

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge, on November 23, 1998.

partnership, may have seriously prejudiced Landise's claims. Thus, we reverse and remand for a new trial.[1]

## I.

In June 1986, after Landise completed law school, Thomas Mauro, then employed with the law firm of Malley, Scott, Koffman & Heston ("Malley, Scott") hired her to work for the firm as a law clerk. When Landise was admitted to the Virginia Bar, she was hired by Malley, Scott as an attorney in the firm's District of Columbia office.[2] In early 1987, Mauro was terminated by the firm. Although Malley, Scott offered to continue to employ Landise, she chose to leave with Mauro. Landise was receiving a salary of $25,000 per year, had two children and owed a large student debt at the time she left Malley, Scott.

It is undisputed that Landise and Mauro started a firm sometime in 1987 named "Mauro and Landise." Letterhead stationery and a sign on the door identified the firm by that name.[3] Both Mauro and Landise signed the lease for the firm's sole office, which was located in the District of Columbia. Beyond these basic facts, the parties offered differing accounts of their relationship.

According to Landise, in January 1987, Mauro induced her to leave Malley, Scott by telling her that he did not think Malley, Scott would be around for long. She claims that Mauro proposed that she join him as a partner to share equally in all profits and losses of the cases that were handled by either her or Mauro. Landise testified that after agreeing to become Mauro's partner, she would periodically bring up the issue of creating a written partnership agreement, but that Mauro would always dismiss the issue. She dropped the issue once the first tax return was filed, as a partnership. In any event, their understanding was never reduced to writing.

Landise testified that about half of the law firm's practice was personal injury work, including several cases in Virginia. She also testified that fees from the Virginia cases constituted approximately half of the firm's revenue received through March 15, 1989. Income from all cases was deposited into the firm's operating account and the parties paid themselves "draws." Landise also testified that while Mauro was chiefly responsible for attracting clients to the firm, she performed 65% to 70% of the firm's written pre-trial work.

Prior to judgment in the *Tuerr* case, the law firm's cash flow had not been good, and

1. We reject Landise's claim that the trial court erred in holding itself bound by the jury verdict that there was no partnership when it denied Landise's request for an accounting. If there was no partnership, there was no need to address the claim for an accounting. *See Beckman v. Farmer,* 579 A.2d 618, 632 n. 19 (D.C.1990); *id.* at 658–59 (Steadman, J., concurring).

 We also reject Landise's claim that the trial court abused its discretion when it allowed Mauro to present Landise's unauthorized practice as a defense to her claim of partnership because, although Mauro had claimed that the contract was illegal in his answer, Mauro had not included the issue in his pretrial statement and only raised it in a motion to dismiss filed shortly before trial; and when it denied her motion to amend the complaint to assert a claim of quantum meruit, asserted following the close of the evidence. With respect to Mauro's unauthorized practice of law defense, the trial court noted that Landise had been put on notice by the answer; with respect to Landise's request to add a quantum meruit claim, the judge noted that Landise had refused Mauro's settlement overtures and discovery on the issue. *See* Super. Ct. Civ. R.

15(b) (1998); *Emerine v. Yancey,* 680 A.2d 1380, 1385 (D.C.1996).

2. Landise was admitted to practice in Virginia, but was not admitted to the District of Columbia Bar.

3. Initially, the firm's stationery did not indicate that Landise was admitted to practice only in Virginia. The letterhead was later corrected to add that information, in conformance with DR 2–102(D), which provided:

> A partnership shall not be formed or continued between or among lawyers licensed in different jurisdictions unless all enumerations of the members and associates of the firm on its letterhead and in other permissible listings makes clear the jurisdictional limitations on those members and associates of the firm not licensed to practice in all listed jurisdictions....

Such a notation, however, does not insulate a person who is in fact engaged in the unauthorized practice of law in the District of Columbia as set forth in D.C.App. R. 49.

in late 1988, Landise accepted an offer of employment with the federal government.[4] Before she left the firm, however, Landise devoted a substantial amount of her time to the *Tuerr* personal injury case. Landise testified that she made the initial contact with the client, drafted the complaint and did virtually all of the pre-trial preparation work. She estimated that she spent more than 2,000 hours working on the case. Landise left the firm to begin working for the government one week after the jury returned a verdict for $800,000 in favor of the firm's client. She testified that even after she had left the firm, she agreed to draft Tuerr's brief in opposition to post-judgment motions. According to Landise, 85% to 90% of the post-trial brief filed with the court by Mauro was identical to her draft and much of Mauro's appellate brief was word for word the same as her post-trial brief.[5] Landise's uncontradicted testimony was corroborated by two persons who had shared space in the same office, Bernard Simbole and Jeffrey Fanger.[6]

In addition to her testimony, Landise presented substantial documentary evidence of the existence of a partnership in the form of tax returns and insurance and bank documents. The 1987 federal and District of Columbia tax returns for the law firm were signed by both Landise and Mauro, and included a K–1 distribution of partnership income form which listed both parties as equal partners. The 1988 federal and 1988 and 1989 District of Columbia tax returns for the firm were for the period of 1988 through March 15, 1989; they were signed solely by Mauro and filed after Landise had left the law firm to join the federal government. The 1988 K–1 form still listed Landise as a partner, but Landise's share of the partnership had been reduced from 50% to 34%;

Mauro's share correspondingly had increased from 50% to 66%. Applications for malpractice insurance and a November 16, 1988, check for the insurance premium for the law firm of Mauro and Landise were signed by Mauro as partner and listed Landise as a partner. A bank signature card for the law firm also listed both parties as partners. The record demonstrates that documents filed on behalf of the law firm "Mauro and Landise" reflect that Landise was a partner and, in most cases, an equal partner, with Mauro. Mauro testified that after Landise left the firm, he acquired a new tax identification number for his business, and began using a new name, "Mauro & Associates."

Mauro's testimony painted a different picture of the terms of his understanding with Landise. According to Mauro, there was no partnership. Rather, he offered Landise only office space, and to pay her a salary, while she established her own practice. He also testified, however, that he informed her that if she were willing to share expenses, he would add her name to the letterhead. Mauro testified that he made most of the decisions at the firm, did all the planning in the *Tuerr* case and performed all of the substantive in-court work for both the Virginia and District of Columbia cases handled by the firm. Mauro stated that, as an experienced lawyer, he had no need to go into partnership with a fledgling lawyer such as Landise. He conceded, however, that a firm with more than one attorney would likely attract clients better than a sole practitioner. Mauro also testified that he advanced all of the money needed by the law practice. Landise corroborated Mauro's testimony in this regard by testifying that she did not contribute any substantial amount of money, but said that she did contribute some personal property—

4. According to the law firm's tax returns for the first year of operation, 1987, the firm's profit was $2,799.00, after Landise drew $9,025.00 and Mauro drew $9,553.30. Operations during 1988 yielded a similarly bleak financial situation. In *Otis Elevator Co. v. Tuerr*, 616 A.2d 1254 (D.C. 1992), this court affirmed an $800,000 judgment in favor of Tuerr, who had been represented by Mauro and Landise. Following affirmance, the firm received $390,917.32 in contingent fees from the *Tuerr* case. The fees, which were received after Landise left the firm, were for work done while Landise was still with Mauro and Landise.

5. The jury was given copies of Landise's handwritten draft of the post-judgment brief, the brief actually filed in the trial court and the brief on appeal.

6. However, there was also testimony from a retired lawyer, Thomas Rothwell, who stated that he was paid $50,000 by Mauro to prepare the *Tuerr* appellate brief.

law books, office equipment and a microwave oven.[7]

Mauro admitted signing tax filings, malpractice insurance application papers and banking records which listed Landise as a partner, but denied the assertion of partnership contained on the face of these documents. Instead, Mauro claimed, he filed partnership tax returns naming Landise as a partner purely as a benefit to Landise; as the firm's profit was less than her draw, if she were listed as a partner, she would then not have to pay taxes on the money she received from the firm.[8]

At trial, one of Mauro's principal arguments that Landise was not his partner was his contention that because Landise was not admitted to practice in the District of Columbia, he would not have, as a matter of fact, and could not have, as a matter of law, entered into a partnership to practice law with Landise in the District. Mauro testified that he would not have entered into a partnership with a lawyer unlicensed in the District. During trial, repeated reference was made to Landise's failure to seek admission to the D.C. Bar, her actions in the course of representing the firm's clients, and whether those actions constituted unauthorized practice. In closing argument, Mauro's counsel argued to the jury that "the Judge will tell you if you conclude that [Landise's] practice in D.C. was without a license, you *must* find for Mr. Mauro you *must* do it." (Emphasis added).[9]

The trial court refused Landise's request to bifurcate the issue of partnership from the issue of unauthorized practice. Instead, the jury was instructed and given a special verdict form consisting of six questions, the first of which concerned the existence of a partnership and the last of which addressed the issue of unauthorized practice.[10] The jury

7. There was also testimony from Ann Bissonnette, who was first employed as a "gofer" for Mauro and Landise during the period March—May 1987, and who later, from August 1987—February 1988, was hired as a full-time office manager. Bissonnette testified that Mauro had the final say on administrative matters, did all the hiring and reviewed and edited all the work that left the office. She also testified that Landise worked an 8:30 to 5:30 day, and that she saw Landise take work home only once or twice.

8. The trial court twice commented that Mauro's explanation concerning the documentary evidence was "preposterous."

9. The argument that any partnership between Mauro and Landise would be unenforceable because it would be an "illegal" contract was first made in Mauro's answer to the complaint. See *supra*, note 1. In a motion to dismiss filed just before trial, Mauro claimed that even assuming the existence of a partnership agreement, it would be illegal and unenforceable due to Landise's "conceded" unauthorized practice of law, *e.g.*, her representation of clients in the District of Columbia without seeking to appear *pro hac vice*. Landise opposed the motion then, as she does in this appeal, on the ground that her unauthorized practice is legally irrelevant to the issue of partnership. The trial court denied the motion to dismiss, but agreed that Mauro could use Landise's unauthorized practice as a "shield" in defense of her partnership claim and joined the issue of unauthorized practice for trial.

10. The pertinent part of the instructions follows:
The first question is simply this: Did the jury find by a preponderance of the evidence that the plaintiff, Sarah Landise, and the defendant, Thomas Mauro, entered into an oral contract to form a partnership for the practice of law? And you're going to have to answer that "yes" or "no." And if you answer it "no," that will conclude your deliberations in this case. If you answer it "yes," then you have to go on and determine some other things.

The second question is: Does the jury find by a preponderance of the evidence that the defendant, Thomas Mauro, breached his partnership contract with the plaintiff, Sarah Landise?

So the first two questions deal with whether there was a partnership, and if so, whether there was any breach of the partnership agreement.

Then the third question is going to be: Does the jury find by a preponderance of the evidence that the defendant, Thomas Mauro, breached his fiduciary duty to the plaintiff, Sarah Landise? And I am going to talk about fiduciary duty in a moment.

.The fourth question is going to be: Does the jury find by a preponderance of the evidence that the defendant, Thomas Mauro, converted property of the plaintiff, Sarah Landise? And you'll be required to answer that question "yes" or "no." And I'll talk to you a little bit about conversion.

Finally, the question will be: If you find there was a partnership agreement, and you find either that there was a breach of the agreement or there was a conversion on or there was a breach of fiduciary duty, if you find any or all of those things, then you'll be called upon to determine the amount of damages to award the plaintiff in this case.

Now, there's one other question at the end that is called the special interrogatory, and it's

found that Landise and Mauro did not enter into an oral partnership contract and that Landise had engaged in the unauthorized practice of law in the District of Columbia. Landise moved for a new trial and for judgment as a matter of law on the issue of whether Landise had engaged in the unauthorized practice of law, both of which were denied by the trial court.

## II.

Landise argues that the judge's instructions concerning the unauthorized practice of law issue may have distorted the jury's consideration on the partnership issue, thereby seriously prejudicing her. She contends that the case must be retried because there is a possibility that the jury may have rested its verdict on an impermissible basis, and this court cannot determine the basis for the jury's finding that there was no partnership. *See District of Columbia v. White*, 442 A.2d 159, 165 (D.C.1982) (holding that where several theories of liability, one impermissible, may account for the verdict, if court cannot determine upon which theory jury relied, case must be remanded for retrial). *But see Nimetz v. Cappadona*, 596 A.2d 603, 607–08 (D.C.1991) (noting that *White* rule cannot be invoked by a defendant who fails to preserve issue by requesting appropriate jury instruction). Specifically, Landise contends that based on the jury instructions and jury verdict form, it is impossible to say whether the jury found there was no partnership because of a failure of evidence of formation of a contract or because it considered that no partnership contract could be lawful or enforceable because appellant had engaged in the unauthorized practice of law in the District of Columbia.

 As a procedural matter, we perceive no reversible error, standing alone, in the format of the trial court's instructions and its inclusion of question six on the jury

verdict form concerning Landise's unauthorized practice of law.[11] As she disagreed with the trial court on the relevance of her alleged unauthorized practice to her partnership claim,[12] Landise properly requested a special verdict in order to preserve for appeal the issue of the availability of an unauthorized practice defense. *See Robinson v. Washington Internal Medicine Assoc.*, 647 A.2d 1140, 1143 (D.C.1994) (citing *Nimetz v. Cappadona, supra*, 596 A.2d at 607–08).

 We do disagree, however, with the trial court's legal conclusion necessitating this procedure, that if Landise had engaged in unauthorized practice in the District of Columbia she could not prevail in her claim against Mauro. The District of Columbia Uniform Partnership Act defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit." D.C.Code § 41–105(a). Proof of the existence of a partnership depends on evidence that the purported partners intended "to associate together to carry on as co-owners for profit." *Beckman v. Farmer, supra* note 1, 579 A.2d at 627. These principles of partnership law apply to lawyers creating associations to form law firms. Lawyers, of course, are also subject to the rules governing their professional conduct promulgated by this court. *See* D.C.Code § 11–2501 (1995); D.C. Bar R. X (1998). Under those rules, lawyers admitted to practice in the District of Columbia are permitted to enter into partnerships with lawyers from other jurisdictions. *See* Code of Professional Responsibility DR 2–102(D); Rule of Professional Conduct 7.5(b). There is no prohibition on an attorney sharing fees in partnership with an attorney licensed to practice in another state, *see* CHARLES W. WOLFRAM, MODERN LEGAL ETHICS, 867 n. 98 (1986) (citing *Dietrich Corp. v. King Resources Co.*, 596 F.2d 422, 426 (10th Cir.1979)), nor indeed,

a *special issue to decide in this case. And I will instruct you on it, as well. And that is: Does the jury find by a preponderance of the evidence that the plaintiff was engaged in the unauthorized practice of law in the District of Columbia? And you will be required to answer that "yes" or "no."*

11. Although Landise complains on appeal that the instructions given by the trial court provided no guidance to the jury as to how Landise's unauthorized practice should have been viewed in relation to the question whether a partnership existed, she requested no such guidance at trial.

12. See *supra* note 9.

since 1991 in our jurisdiction, with nonlawyers under certain specific circumstances, *see* Rules of Professional Conduct 5.4(a)(4) and (b).[13] Thus, the fact that Landise was not admitted to the D.C. Bar did not in and of itself make her or Mauro incapable of entering into partnership with each other under governing principles of partnership law, or render their agreement to share fees unethical under our rules—assuming such an agreement were found to exist.

█ A somewhat different question is whether Landise's unauthorized practice of law is available to Mauro as a defense to vitiate a partnership agreement to which he was a party. We hold that in the context of a claim for breach of a law partnership agreement *inter sese*, brought by a party claiming to be a partner, the facts that the claimant, because she was not admitted to practice in the District of Columbia, may have engaged in the unauthorized practice of law in this jurisdiction does not bar the claim against a knowing, willing purported partner

or firm.[14] There is no public interest at stake in such a private dispute that would be sufficiently furthered by refusing to enforce the claim. *See J.H. Marshall & Assoc., Inc. v. Burleson,* 313 A.2d 587, 599 (D.C.1973) (citing CODE OF PROFESSIONAL RESPONSIBILITY CANON 3, Note 1 ("The condemnation of the unauthorized practice of law is designed to protect the public from legal services by persons unskilled in the law.")). To render the contract unenforceable in such a situation would frustrate the expectations of a party and deny that party the fruit of her labors. *See Metzler v. Edwards,* 53 A.2d 42, 44–45 (D.C.1947); RESTATEMENT (SECOND) OF CONTRACTS § 178 (1981);[15] *cf. Cevern v. Ferbish,* 666 A.2d 17, 21 (D.C.1995); *id.* at 26 (Ruiz, J., dissenting). Finally, while we recognize that Landise's unauthorized practice of law violates our own court rule, D.C.App. R. 49, we cannot lose sight of the fact that Landise's unauthorized practice directly implicated Mauro's own violation of our professional rules as well.[16] Although some might pro-

---

13. Even prior to 1991, under the CODE OF PROFESSIONAL RESPONSIBILITY a lawyer admitted in one state was not considered a nonlawyer for purposes of dividing fees with a lawyer admitted in a different state. *See* ABA Comm. on Professional Ethics Formal Op. 316 (1967).

14. Different principles would apply if the claim were brought by a third party or a client who had been injured as a result of unauthorized practice or a lawyer's misconduct, or where the court is acting to prohibit unauthorized practice before it. *Compare Fletcher v. Krise,* 73 App.D.C. 266, 267, 120 F.2d 809, 810 (1941) (lawyer's disbarment resulting in the inability to render professional services to client is a legal defense for client in lawyer's suit to enforce contingent fee agreement), *and J.H. Marshall & Assoc., supra,* 313 A.2d at 592 (dismissing collection agency's suit to collect assigned debt, which was held to constitute unauthorized practice before the court), *with Burleson v. United Title Escrow Co.,* 484 A.2d 535, 536–37 & n. 3 (D.C.1983) (holding that defendant has no standing to assert defense of unauthorized practice where defendant was not injured thereby and rejecting unauthorized practice as an actionable tort).

15. The RESTATEMENT states a general rule regarding the unenforceability of contracts on grounds of public policy:

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly out-

weighed in the circumstances by a public policy against the enforcement of such terms.

(2) In weighing the interest in the enforcement of a term, account is taken of

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

(3) In weighing a public policy against enforcement of a term, account is taken of

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

16. For Mauro to include Landise in the firm's name in the absence of a partnership between them would have been a clear violation of DR 2–101(A), B(6) and 2–102 of the Code of Professional Responsibility, and Rule of Professional Conduct 7.5(d) and comment 2, by Mauro as well as Landise. *See In re Karr,* 722 A.2d 16, 25–26 (D.C.1998); *see also J.H. Marshall & Assoc., Inc., supra,* 313 A.2d at 592 ("Canon 3 of the Code of Professional Responsibility ... places upon all members of the bar a responsibility to assist in preventing the unauthorized practice of law.") (internal quotations omitted); Rule of Professional Conduct 5.5(b).

pose that we simply declare a "pox on both their houses," to do so in this context would be overly simplistic as it would bestow a windfall, at the expense of another and without significant public benefit, on a party who participated in and benefitted from the unauthorized practice.

In this case, Landise's unauthorized practice was only marginally relevant as evidence of Mauro's subjective intent: whether Mauro would have wanted to enter into a partnership with Landise in a law firm operating in the District of Columbia when she was not admitted to practice here. *But see Beckman, supra,* 579 A.2d at 627 ("[T]he question [of partnership] ultimately is objective: did the parties intend to do the acts that in law constitute partnership?") (internal quotations and citations omitted). Whatever inference favorable to Mauro's subjective intent not to enter into a partnership with Landise could have been drawn from a determination that Landise's practice in the firm would have been unauthorized was severely undermined, moreover, by undisputed evidence that the two of them practiced under the law firm name, "Mauro and Landise." To hold Landise out as his partner—as Mauro clearly did in the firm's name and in other documentation presented to an insurer, bank and local and federal taxing authorities—was powerful evidence of a partnership between the two. *See id.*

In this context, the jury's verdict finding *both* that there was no partnership *and* that Landise had engaged in the unauthorized practice of law raises a serious question of how the jury came to its decision on the partnership question. Specifically, even though the trial court properly submitted separate questions on the two issues, we cannot confidently conclude that the jury found, after weighing the evidence, that there was no partnership because Landise failed to meet her burden of proving the existence of a partnership contract, or whether the jury concluded that there could be no partnership because Landise engaged in unauthorized practice in the District of Columbia.[17] The latter would be an impermissible verdict because it would be based on an incorrect understanding of the applicable legal principles. On this record, there is evidence to support Landise's contentions that *the jury may have been confused about the minor import that her unauthorized practice of law should have had in the jury's evaluation of the central issue in the case, whether there was a partnership between Landise and Mauro, and that the jury's verdict therefore may have rested on an impermissible basis. See White, supra,* 442 A.2d at 165.

■■■ A related issue on appeal is Landise's claim that the trial court erred in denying her motion for a directed verdict on the unauthorized practice of law issue. A directed verdict is proper when, reviewing the evidence in the light most favorable to the nonmovant, the jury has "no evidentiary foundation on which a reasonable trier of fact could base a reliable verdict...." *Jackson v. Condor Management Group, Inc.,* 587 A.2d 222, 224 (D.C.1991). We review motions for judgment as a matter of law *de novo. See WMATA v. Jeanty,* 718 A.2d 172, 174–75 (D.C.1998). Landise argues that a directed verdict was required in this case because Mauro failed to present the evidentiary foundation for a jury finding that Landise engaged in the unauthorized practice of law in the District of Columbia.

■■■ The judge instructed the jury that either holding out as a licensed lawyer or engaging in the practice of law in the District of Columbia would constitute unauthorized practice unless the person is enrolled as an active member of the Bar of the District of Columbia.[18] For reasons already

---

17. That the jury may have been confused is supported by the face of its completed verdict from. The trial judge instructed that if the jury answered the first question, concerning the existence of a partnership, in the negative, "that will conclude deliberations in this case." See note 10. However, after answering the first question in the negative, the jury nonetheless proceeded to answer the sixth question, concerning unauthorized practice of law, in the affirmative.

18. In its instruction concerning the special interrogatory on unauthorized practice of law, the trial court emphasized that the burden of proof was on Mauro. On the substantive issue of what constitutes unauthorized legal practice, the trial court stated:

indicated, there was sufficient evidence which could lead a reasonable juror to find that Landise was engaged in the unauthorized practice of law, by, at a minimum, finding that Landise held herself out, without disclaimer, as authorized to practice in the District of Columbia even though she was not admitted to practice here.[19]

## III.

We now turn to the evidentiary ruling made in the course of the trial that we determine was erroneous and, when considered against the background we have set out in previous sections, requires a new trial.

At trial Landise sought to introduce evidence that during a meeting held on February 26, 1989, the day before Landise was to join the federal government and before the *Tuerr* trial judgment was finally affirmed on appeal in 1992, Mauro proposed to change their respective shares in the *Tuerr* fee so that Landise would receive a reduced share, one third of any eventual fee in the *Tuerr* case, and divide equally the other assets and liabilities of the firm. The trial court excluded Mauro's proposal on the ground that it constituted a settlement offer.[20] The trial court allowed Landise to testify only to the

fact that the two of them met to discuss the winding up of the law firm and that they had discussions about how the proceeds of the firm would be divided, but did not allow the specific terms of Mauro's proposal to be presented to the jury. The trial court stated that the actual discussions between Landise and Mauro would be "only marginally probative" and that Mauro would have been prejudiced by testimony of the terms of his offer to settle a dispute. On appeal, Landise argues that the substance of Mauro's proposal was relevant and admissible to show that Mauro acknowledged the existence of a partnership between them and that its exclusion caused her substantial prejudice.

■■■ The law of evidence generally excludes offers to compromise a disputed claim of liability. *See Beckman v. Farmer, supra,* 579 A.2d at 646; JOHN W. STRONG, McCORMICK ON EVIDENCE § 266, at 194 (4th ed.1992). This principle, which reflects skepticism about the relevance of such offers to the issue of liability and is intended to promote out-of-court settlements, is not applicable when there is no actual dispute. *See Crain v. Allison,* 443 A.2d 558, 565 (D.C. 1982). In this case, the trial court declined to admit the evidence because it considered that it constituted an offer of settlement, and

No person shall regularly engage in the practice of law in the District of Columbia, or in any manner hold himself or herself out as authorized or qualified to practice law in the District of Columbia unless that person is enrolled as an active member of the Bar of the District of Columbia.

No person shall in the District of Columbia advise or counsel any person on matters affecting legal rights, or practice or appear as an attorney at law for a person, or hold out to the public as being entitled to practice, or use or advertise the title of "lawyer," "attorney," or "counselor," or any equivalent title in such manner as to convey the impression that the person is entitled to practice law, or in any manner it is that such person either alone or together with any other person or persons maintains an office for the practice of law in the District Of Columbia without being an enrolled, active member of the bar.

The judge further explained that "the practice of law does not include things such as the drafting of pleadings that are signed by another lawyer who is a member of the bar ... [or] doing legal research ... [or] conferring with witnesses." These instructions were taken almost verbatim from the then-existing Rule 49(b)(1)

and (2). That rule has subsequently been revised and expanded.

19. Landise also argues that an expert witness was necessary to assist the jury's understanding of the complexities of a law partnership and establish a standard of behavior. *See O'Neil v. Bergan,* 452 A.2d 337, 341–42 (D.C.1982) (plaintiff who fails to call expert witness fails to make out *prima facie* case of legal malpractice). We do not question that generally speaking an expert witness is helpful on the issue of what constitutes engaging in the practice of law. However, even without expert testimony to guide the jury's understanding of what constitutes the practice of law for purposes of Rule 49, a lay juror could easily find, applying the trial court's instructions, that Landise held herself out as licensed in the District of Columbia, by including her name in a District of Columbia firm's letterhead without disclaimer.

20. Mauro does not contend that Landise's testimony would have been excludible as hearsay, presumably because it would be an admission of a party opponent. *See Proulx v. Police & Firemen's Ret. & Relief Bd.,* 430 A.2d 34, 36 (D.C. 1981).

that Mauro's statement would add very little to Landise's "overwhelming evidence" on the partnership issue.

■ The trial court's exclusion of Mauro's proposal as coming within the scope of inadmissible offers to compromise was an abuse of discretion. First, the record does not support a finding that at the time of the February 26, 1989 meeting, there was a dispute between the parties. To the contrary, indications are that the relationship between the parties at that time was still amicable. The meeting occurred the day before Landise began to work for the federal government and was for the purpose of dividing the firm's assets and liabilities as a result of Landise's departure from the firm. Subsequent to the meeting, Landise prepared a draft post-trial brief on the *Tuerr* case, filed by Mauro on March 16, 1989, which supports the view that Mauro and Landise were still working together. Although there was some evidence that Landise considered taking legal action against Mauro soon after, this lawsuit was not filed until nearly two years later, after the *Tuerr* judgment, which constituted the firm's principal asset, was affirmed on appeal. In light of the firm's otherwise meager fees, there would have been little reason for Landise to assert her partnership claim against Mauro before that time. "[O]nly offers of compromise made *after* a controversy ha[s] arisen fall within the exclusionary rule and, here, [Mauro's] offer was made before [Landise] brought the suits . . . ." *Joyner v. Jonathan Woodner Co.*, 479 A.2d 308, 312 n. 5 (D.C.1984).

■ Second, we perceive no basis for the trial court's rationale that because Landise's evidence of a partnership with Mauro was "overwhelming," evidence of Mauro's proposal when their relationship came to an end was of marginal significance to Landise's presentation of her partnership claim to the jury. Although the trial court undoubtedly has discretion to exclude cumulative evidence, presentation of the terms of Mauro's proposal was not merely cumulative, but served to respond to a particular component

of Mauro's defense. During trial Mauro claimed that notwithstanding objective evidence of partnership,[21] he never intended to form a partnership with Landise, whom he described as a neophyte to the profession. Mauro's proposal, therefore, evidencing as it did his understanding at the time that their existing relationship entitled Landise to a one-half share in the firm's fees, as demonstrated by his proposal to reduce her portion of the *Tuerr* fee but otherwise equally divide the firm's fees and liabilities with Landise, was highly relevant and probative of the fact that he had intended to go into partnership with Landise notwithstanding his contrary protestations at trial. *See* D.C.Code § 41–106(4) (1990) ("The receipt by a person of a share of the profits of a business is prima facie evidence that [s]he is a partner in the business"); *see Beckman, supra,* 579 A.2d at 628. Exclusion of the substance of the terms of Mauro's offer was correspondingly highly prejudicial to Landise.

■ As the record reveals, and was remarked upon by the trial judge who heard the evidence firsthand, the weight of the evidence overwhelmingly supported the existence of a partnership between Mauro and Landise. Viewed in the context of the evidence and instructions at trial, the jury's verdict that there was no partnership, therefore, can be explained on either of two grounds: either the impermissible one based on Landise's unauthorized practice, see discussion in text *supra,* or the jury's crediting Mauro's statements that he did not intend to enter into partnership with Landise. The excluded terms of Mauro's proposal in 1989 directly contradicted Mauro's testimony at trial concerning his purported intent. In the totality of this trial as it played out, the trial court's erroneous exclusion of that evidence cannot be deemed harmless and Landise is thus entitled to a new trial.[22]

*Reversed and remanded.*

---

**21.** As discussed earlier, Mauro gave various explanations why the documentary evidence did

not reflect the true nature of his affiliation with Landise.

**22.** We also note that Landise filed a motion for

new trial, which was denied. "[A] new trial may be granted ... where the verdict is against the weight of the evidence, ... the trial was unfair, or there was a prejudicial legal error in the proceedings." *Bell v. Westinghouse Elec. Corp.*, 483 A.2d 324, 327 (D.C.1984) (citation omitted); *see also WMATA v. Davis*, 606 A.2d 165, 168 n. 4 (D.C.1992). In light of our conclusion that the trial court committed reversible error, we need not reach Landise's claim that denial of her new trial motion was an abuse of discretion.