The GOVERNMENT OF RWANDA, Plaintiff,

v.

RWANDA WORKING GROUP et al., Defendants.

No. Civ.A. 97–1550(RMU).

United States District Court, District of Columbia.

Aug. 27, 2002.

**50**

---

David J. Farber, Lisa M. Dwyer, John A. Rosans, Patton Boggs, LLP, Washington, DC, for plaintiff.

Joseph Peter Drennan, Alexandria, VA, for defendant, Robert W. Johnson II.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

URBINA, District Judge.

RULING FOR THE PLAINTIFF ON THE ISSUE OF CONVERSION; RULING FOR THE PLAINTIFF ON THE ISSUE OF BREACH OF FIDUCIARY DUTY; RULING FOR THE PLAINTIFF ON THE ISSUE OF PUNITIVE DAMAGES

### I. INTRODUCTION

The controversies in this case are distilled from events involving political upheaval and its aftermath. The court must now resolve issues of contract law and the fiduciary duties of legal counsel in the environment of international affairs. Despite the dramatic circumstances that give context to the dispute before the court, the question presented is straightforward: with what expectations and under what strictures does counsel perform on behalf of a client?

This case comes before the court following a two-day bench trial. The current

Government of Rwanda ("the plaintiff" or "the Republic") filed its complaint on July 7, 1997 against the Rwanda Working Group ("RWG"), an association allegedly hired to perform lobbying services by the government that ruled Rwanda from April to July 1994 ("the interim government"), Robert W. Johnson II ("defendant Johnson" or "Mr. Johnson" or "the defendant"), an attorney for the predecessor government and an alleged member of the RWG, and Aloys Uwimana ("Mr. Uwimana" or "Ambassador Uwimana"), the predecessor government's ambassador to the United States.

The plaintiff's claims of conversion and breach of fiduciary duty against defendant Johnson and the RWG seek the return of $83,000 (the sum of $28,000 paid by the interim government to Mr. Johnson and/or the RWG under one contract and $55,000 paid to Mr. Johnson and/or the RWG under a second contract) plus punitive damages. Compl. ¶¶ 56–65.

At an earlier stage of the litigation, defendant Johnson filed a motion to dismiss for lack of subject-matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and 12(h), and the plaintiff filed a motion for partial summary judgment. Defendant Johnson moved to dismiss the complaint as to himself on the ground that the plaintiff's claims failed to satisfy the $75,000 diversity jurisdiction requirement of Title 28 U.S.C. § 1332(a).[1] In turn, the plaintiff moved for partial summary judgment against Mr. Uwimana and defendant Johnson.

In a Memorandum Opinion dated March 19, 2001, the court denied defendant Johnson's motion to dismiss and denied the plaintiff's motion for partial summary

---

**1.** To date, Mr. Uwimana has entered bankruptcy and this action has been automatically stayed against him pursuant to the bankruptcy code, 11 U.S.C. § 362. Pl.'s Mot. for Partial Summ.J. at 5.

judgment. *Gov't of Rwanda v. Rwanda Working Group,* 150 F.Supp.2d 1 (D.D.C. 2001). The court held that the plaintiff's well-pled allegations of fact about the amount in controversy were sufficient to survive defendant Johnson's motion to dismiss for subject-matter jurisdiction and that issues of fact prevented granting the plaintiff's motion for partial summary judgment. *Id.*

On May 20, 2002, the parties began a two-day bench trial before this court. Having now considered the testimony and evidence presented at trial, the arguments and submissions of counsel, and the relevant law, the court rules for the plaintiff on the issue of conversion and on the issue of breach of fiduciary duty. In addition, the court rules for the plaintiff on the issue of punitive damages.

## II. BACKGROUND

### A. Undisputed Facts

In 1994, massive upheaval engulfed the country of Rwanda. On April 6, 1994, when Rwandan president Juvenal Habyarimana died in a plane crash after 21 years in power, simmering political unrest erupted into civil war. Def.'s Opp'n to Pl.'s Mot. for Partial Summ.J., Ex. 6 (citing 1995 DEP'T ST. COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1994, Rwanda Section). Ethnic tension between the Hutu (85 percent of the population) and the Tutsi (14 percent of the population) escalated when Hutu extremists massacred hundreds of thousands of people, most of whom were Tutsi. *Id.* The Rwandan Patriotic Front ("RPF"), the current government, which is comprised largely of Tutsi's, halted the killings with a military offensive that overtook the self-proclaimed Hutu leadership in July 1994. *Id.* The ascension of the Rwandan Patriotic Front led to a massive flight of Hutu civilians out of Rwanda for fear of Tutsi reprisal. *Id.*

The plaintiff in this action is the Republic, or the Government of Rwanda, which succeeded what became generally known as the "Interim Government." Joint Pretrial Statement ("Joint PTS") at 1. The Republic brought this action against defendant Johnson, the RWG, and defendant Mr. Uwimana, the former ambassador to the interim government, alleging conversion and breach of fiduciary duty based on two separate contracts. *Id.* The parties stipulated to the following facts: (1) the plaintiff, the Republic, is the current legitimate Government of Rwanda; (2) Mr. Uwimana was given until July 22, 1994 to return his diplomatic credentials to the U.S. Department of State; and (3) Mr. Uwimana turned in his diplomatic credentials/letter of credence to the United States Department of State on July 22, 1994. *Id.* at 26. In addition, the parties stipulated during the trial to the fact that Mr. Uwimana was the Ambassador of Rwanda until about 5:00 p.m. on July 22 when he turned in his credentials.[2] Tr. at 212.

Finally, both the Republic and Mr. Johnson agree that "Johnson came into possession of $83,000 of the Republic's funds, pursuant to the July 8 [Memorandum of Understanding ("MOU")] and the July 22 Letter Agreement." Joint PTS at 4. Under the first contract, the July 8, 1994 MOU, Mr. Johnson, on behalf of the RWG, received $28,000 from the Republic for services. *Id.* at 20. Two weeks later, under the second contract, the so-called "July 22 Letter Agreement," Mr. Uwimana

---

**2.** Since all the relevant dates in this case occurred in 1994, any dates mentioned that exclude a year refer to that date in 1994.

agreed to transfer $55,000 to Mr. Johnson. *Id.* at 21.

## B. The Plaintiff's Claims

First, the plaintiff claims that the services it contracted for under the July 8 MOU never took place. Joint PTS at 1. In addition, the plaintiff alleges that the RWG consisted of the Washington World Group, Inc., represented by lobbyist Edward van Kloberg, III, the Foreign Policy Group, Inc., represented by lobbyist Timothy Towell, and Mr. Johnson. *Id.* at 1–2. "The Republic has settled its claims vis-à-vis van Kloberg and Towell for the sum of $26,200. Thus, the Republic seeks only to recover from Johnson the sum of $1,800," i.e., the remaining portion of the $28,000 under the July 8 MOU. *Id.* at 2.

Second, under the July 22 Letter Agreement, defendant Johnson, acting as counsel to Rwanda, received $55,000 for legal services he was to perform on behalf of the Rwandan Embassy and its diplomats and staff. *Id.* at 2. The plaintiff claims that defendant Johnson knew that the $55,000 was transferred to him for *ultra vires* purposes: to assist in the defection of Mr. Uwimana, his two subordinates at the Embassy, Boniface Karani and Jean–Baptiste Rwakazina, and their families. *Id.* at 2. The Republic alleges that despite having this knowledge, defendant Johnson "nevertheless accepted the funds and expended them to his client's detriment." *Id.* Moreover, the plaintiff asserts that Mr. Johnson continued to convert the Republic's funds even after it became clear that Mr. Uwimana's subordinates were no longer in need of defection services, and that Mr. Johnson refused to return the $55,000 despite repeated requests from the Republic to do so. *Id.* Consequently, the plaintiff seeks to recover the full $55,000 from Mr. Johnson. *Id.*

In sum, then, the Republic claims that Mr. Johnson converted these monies by using them for his own benefit against the interests of the Republic and by refusing to return the funds to the Republic, and that, in converting these funds, Mr. Johnson breached his fiduciary duties of good faith and loyalty to the Republic. Joint PTS at 4. The plaintiff also seeks interest that would have accumulated on the $83,000 since the date of the alleged conversion (i.e., the date of transfer) and costs, as well as punitive damages. *Id.* at 3.

## C. The Defendant's Defenses

In terms of the July 8 MOU, defendant Johnson denies that he was a "member" of the RWG and contends that the RWG was the name of a project undertaken by the Washington World Group, Inc. Joint PTS at 2. Next, defendant Johnson contends that, at the time of the July 22 Letter Agreement, Mr. Uwimana was the recognized Ambassador from Rwanda to the United States and thus possessed full plenipotentiary powers and the authority to bind his government in contract. *Id.* Accordingly, Mr. Johnson maintains that the tasks contained in the July 22 Letter Agreement—which included securing immigration counsel on behalf of Mr. Uwimana, his legation, and their dependents to seek territorial asylum in the United States—continued to be a prudent and reasonable mission in light of Mr. Uwimana's diplomatic responsibilities to his legation, "coupled with the chaotic and dangerous situation on the ground in Rwanda at that time." *Id.* at 2–3. Mr. Johnson denies that he converted any of the funds "for his own benefit," and that, at all times, Mr. Johnson acted according to the directives, desires and wishes of the Government of Rwanda, "through the apparent and or actual authority of the latter's ambassador to United States, Uwimana." *Id.* at 5.

## III. FINDINGS OF FACT

### A. Mr. Johnson Was a Member of the RWG

1. Defendant Robert W. Johnson, II is an individual whose principal place of business is at 1275 Pennsylvania Avenue, N.W., Washington, D.C. Tr. at 18. In 1994, Mr. Johnson was a member of the District of Columbia, Alabama, and Virginia bars and was subject to their rules of professional conduct. Tr. at 18.

2. As of July 22, 1994, Mr. Johnson served as an attorney to the Government of Rwanda. Tr. at 12, 141, 167.

3. Despite Mr. Johnson's protestations to the contrary, Mr. Johnson was a member of the RWG, and not merely its lawyer. Tr. at 73, 94. Indeed, Mr. Johnson admits that he did not "act as counsel to the Rwanda Working Group." Tr. at 21.

4. In his pretrial motions and briefs, and at trial, Mr. Johnson consistently denied that he was a member of the RWG. Tr. at 21. At trial, however, both Mr. van Kloberg and Mr. Towell, the other two undisputed members of the RWG, testified without any hesitation that Mr. Johnson was a member of the RWG. Tr. at 74, 94. Mr. Johnson's attorney did nothing to cast doubt on the testimony of Mr. van Kloberg or Mr. Towell, and offered no evidence to substantiate the defendant's vague allegations that these two witnesses were or are biased against Mr. Johnson. Indeed, Mr. Towell referred to Mr. Johnson during his testimony as "a friend of mine." Tr. at 94. The record is devoid of any evidence that Mr. van Kloberg or Mr. Towell harbor or harbored a scintilla of prejudice or ill will against Mr. Johnson.

5. The court finds Mr. van Kloberg's and Mr. Towell's testimony credible and rejects Mr. Johnson's contention that he was not a member of the RWG. Indeed, the court's disbelief of Mr. Johnson's testimony on this important topic presages other assessments of his credibility.

### B. The July 8, 1994 MOU

6. On behalf of Rwanda, Ambassador Uwimana entered into a July 8, 1994 MOU with the RWG to provide lobbying services. Tr. at 112; Exs. 2, 28.[3] Mr. Johnson stated in a letter to the United States government that he had signed the July 8 MOU "on behalf of the Rwanda Working Group." Ex. 28.

7. Mr. Johnson insists that he served as counsel to the Washington World Group, that the RWG was a Washington World Group "project," and that the July 8 MOU was the Washington World Group's contract with Rwanda. Tr. at 20, 21, 29.

8. These assertions have no support in the record. Mr. van Kloberg, the principal of the Washington World Group, testified that he never saw the July 8 MOU in July 1994 or until after this litigation commenced. Tr. at 73. In addition, Mr. van Kloberg testified that Mr. Johnson did not serve as the Washington World Group's lawyer on the Rwanda project, but rather was the "lead member" of the RWG. Tr. at 74. In this capacity, Mr. van Kloberg explained that Mr. Johnson would "prepar[e] the documents, [and] negotiat[e] with Ambassador Mr. Uwimana" while serving as "lead member" of the RWG. Tr. at 74. Moreover, Mr. Johnson's July 19, 1994 letter to Joseph E. Clarkson, chief of the Foreign Agent's Registration Act[4] registration unit, states that he signed the July 8 MOU "on behalf of the Rwanda

---

3. For the trial, the parties submitted joint exhibits. All references to exhibits in this Memorandum Opinion are to jointly numbered exhibits that were admitted at trial.

4. The Foreign Agent's Registration Act is codified at 22 U.S.C. § 611.

Working Group." Ex. 28. The letter says nothing about the Washington World Group. Ex. 28. Once again, these facts call into question Mr. Johnson's truthfulness.

9. Ambassador Uwimana paid Mr. Johnson $28,000 directly with a Rwandan Embassy check issued to the "Robert W. Johnson II Trust Fund" on July 13, 1994. Ex. 22A. Mr. Johnson deposited the check into his trust account that same day. Ex. 22B. On July 13, 1994, Mr. Johnson also sent a receipt in the form of a letter to the Rwandan Embassy, which states in its entirety that "We are in receipt of a check for $28,000 for 'the Rwanda Working Group' for lobbying services." Ex. 13.

10. When asked whether the RWG ever performed any of the services listed in the July 8 MOU for the Embassy of Rwanda, Mr. van Kloberg stated that "[e]vents superseded us." Tr. at 72. He added that the RWG members "worked individually making calls, seeing what was going on in various areas that were germane to us as individuals...." Tr. at 72. Mr. van Kloberg's response demonstrates that because of the civil war engulfing Rwanda, he, and by implication, the co-members of the RWG could not perform the lobbying services contemplated in the July 8 MOU since events in Rwanda had superseded the RWG members. Based on his testimony, the court concludes that Mr. van Kloberg did not perform any of the lobbying or other services contemplated by the July 8 MOU.

11. In addition, Mr. Towell testified unequivocally that he never performed any lobbying services on behalf of Rwanda. Tr. at 97. Specifically, he never attempted to convince the U.S. Department of State to modify its hard-line on Rwanda, he never contacted the White House to modify its position on Rwanda, he never contacted anybody in Congress to modify Congress's position on Rwanda, and he never undertook any activities that would prevent the Department of State from seeking to freeze the Embassy's accounts. Tr. at 97. Based on his testimony, the court concludes that Mr. Towell did not perform any of the lobbying or other services contemplated by the July 8 MOU.

12. Mr. Johnson himself testified that to "the best of my knowledge, there were no lobbying services performed" under the July 8 MOU. Tr. at 26. Mr. Johnson stated that his work pursuant to the July 8 MOU involved "administration of the contract," disbursement of the $28,000, and one conversation with a Riggs Bank employee "regarding whether there was a hold place[d] by the State Department on any funds by Rwanda." Tr. at 23. Mr. Johnson explained that the conversation with the bank employee was his effort to ascertain that any check issued by the Rwandan Embassy pursuant to the contract would be "a good check as opposed to a bad check." Tr. at 23–24.

13. Although Mr. Johnson testified that he was familiar with the Foreign Agent's Registration Act ("FARA"), he never registered with the U.S. Department of Justice as a foreign agent nor did he register as a lobbyist under any other authority of law to lobby on behalf of Rwanda. Tr. at 19, 40. Indeed, exhibit 29 demonstrates that Mr. Johnson received a response to his July 19, 1994 letter from Mr. Clarkson, the FARA official, informing Mr. Johnson that the government required him to register as a lobbyist. Ex. 29.

14. Although all three RWG members admitted that no lobbying work was done, Ambassador Uwimana was under the clear impression that the RWG members had performed the work requested in the July 8 MOU. Tr. at 110–11.

15. In addition, Mr. Johnson wrote a letter dated July 21, 1994 to Ambassador Uwimana stating that the entire $28,000 "has been disbursed or obligated for work performed thus far on various projects...." Ex. 1. Mr. Johnson added that "Mr. van Kloberg and Ambassador Towell have maintained continuous liaison with State Department officials to provide accurate information and to persuade the State Department to modify the White House's hard line with respect to the closure of the Embassy and the expulsion of the diplomatic staff." Ex. 1.

16. As noted previously, both Mr. van Kloberg and Mr. Towell testified that they never did any such work. Based on Mr. van Kloberg's and Mr. Towell's testimony that no such work ever occurred, the court deems Mr. Johnson's statements in his July 21, 1994 letter to Ambassador Uwimana to be blatant misrepresentations.

17. In sum, the only work Mr. Johnson performed pursuant to the July 8 MOU was to administer the contract, disburse the $28,000, and make sure that the checks disbursing the $28,000 would not bounce. Based on the record and all the witnesses' testimony about the July 8 MOU, the court concludes that the three RWG members did not perform the lobbying services contemplated by the July 8 MOU.

### C. The July 22, 1994 Letter Agreement

18. On July 15, 1994, the Department of State issued a Note Verbale stating that "the Department of State has decided to require for the present the cessation of operations of the diplomatic mission [of the Rwandan Embassy], other than activities relating to the closure of the mission, effective July 22, 1994...." Ex. 27. In addition, the Department of State's Note Verbale ordered that "Ambassador Uwimana will be required to depart the United States no later than July 22, 1994." Ex. 27.

19. The Note Verbale directed that Mr. Karani could remain in the United States to oversee the closing of the Embassy, the departure of all other Embassy personnel, and the disposition of all property. Ex. 27. In addition, the Department of State ordered all remaining members of the mission and their family members, including Mrs. Uwimana and the Ambassador's children, to leave the United States no later than August 14, 1994. Ex. 27.

20. Mr. Johnson testified that he almost certainly knew that the Note Verbale had been issued either that same day or the next day, July 16, 1994, but in any event, he definitely knew of its issuance by July 21, 1994. Tr. at 33.

21. Accordingly, Mr. Johnson knew of the Note Verbale when he sent the July 21, 1994 letter to Ambassador Uwimana proposing a set of "ongoing/new projects" for a $55,000 fee. Ex. 1.

22. On the afternoon of July 22, 1994, Mr. Uwimana, in his official capacity on behalf of Rwanda, agreed to the terms of Mr. Johnson's July 21, 1994 letter, which would serve as the blueprint for the July 22 Letter Agreement. Ex. 1. Mr. Uwimana also engaged Mr. Johnson to perform legal services on behalf of the Republic. Ex. 1.

23. There was no doubt that one of the primary objectives—and probably the primary objective—of the July 22 Letter Agreement was for Mr. Johnson to help Mr. Uwimana and other Embassy officials gain asylum in the United States so they would not have to return to a potentially dangerous situation in Rwanda. Ex. 1. Mr. Johnson's July 21, 1994 letter to Mr. Uwimana, which sets forth the "on-going/new projects" that would form the basis of the July 22 Letter Agreement, focuses on the asylum requests. Ex. 1. Indeed, five of the six paragraphs in the "on-go-

ing/new projects" section of the letter concern the asylum requests. Ex. 1. For example, Mr. Johnson wrote that he would "supervise and coordinate the activities of [immigration] Attorneys Drew and Rubin in the preparation of the asylum requests . . . ." Ex. 1. He also wrote that "[w]ith respect to the asylum requests, we will work with the State Department to ensure that their recommendations to the Immigration and Naturalization Service are favorable, and we will obtain testimony from experts that conditions in Rwanda are presently life-threatening." Ex. 1.

24. Under the July 22 Letter Agreement, Mr. Johnson was paid $55,000 with Rwanda funds. Ex. 23.

25. On July 22, 1994, Ambassador Uwimana approved a $55,000 check on an Embassy account to the "Robert W. Johnson II Trust Fund." Ex. 23A. The check was signed by Mr. Rwakazina, the First Secretary of the Rwandan legation, and Mr. Karani, the Embassy's Counselor. Ex. 23A; Tr. at 55. The payor's name on the check reads "L'Ambassade De La Republique Rwandaise," thus clearly indicating that the monies being used to pay Mr. Johnson belonged to the Rwandan government and not to Mr. Uwimana or any other individual. Ex. 23A.

26. On July 22, 1994, Mr. Johnson signed a receipt for "lobbying services." Ex. 14. He deposited the check into his trust fund that same day. Tr. at 56.

27. In the July 22 Letter Agreement, Mr. Johnson explicitly represented that he would provide asylum and other immigration services for Mr. Uwimana and his family to stay in the United States, and would provide the same services for Mr. Karani and Mr. Rwakazina, the two other Rwandans in the Embassy. Ex. 1; Tr. at 56–57.

28. Under the July 22 Letter Agreement, Mr. Johnson told Mr. Uwimana that he would have to use $30,000 out of the $55,000 to pay two immigration attorneys for their services. Ex. 1; Tr. at 56–57.

29. On August 8, 1994, Mr. Uwimana sent a letter to Mr. Johnson informing him that Mr. Karani and his family no longer needed the immigration services provided for under the July 22 Letter Agreement. Ex. 37. Mr. Karani had retained an attorney pro bono to represent him in immigration matters. Ex. 37. In addition, Mr. Uwimana stated that Mr. Rwakazina was also trying to find another lawyer to handle his case for free. Ex. 37. Accordingly, Mr. Uwimana wrote to Mr. Johnson that "I would like to discuss with you using the funds initially budgeted to pay for lawyers to handle the cases for Mr. Karani, Mr. Rwakazina and their families to pay for additional legal, investigative and public relations services in my case." Ex. 37.

30. On August 17, 1994, Mr. Uwimana sent Mr. Johnson a letter stating that Mr. Rwakazina and his family no longer needed immigration services provided for under the July 22 Letter Agreement. Ex. 38.

31. Contrary to the terms of the July 22 Letter Agreement, which provided for $30,000 of the $55,000 to be paid to the two immigration attorneys, Mr. Johnson dispersed only $9,995 to the immigration attorneys, Mr. Todd Rubin and Ms. Shakun Drew. Exs. 23, 23(c), (g)–(j), (*l*), (o), and (r).

32. Contrary to the terms of the July 22 Letter Agreement, which provided for no payments to the Washington World Group or to its principal, Mr. van Kloberg, Mr. Johnson dispersed $24,500 to the Washington World Group and Mr. van Kloberg. Exs. 23(d), (m)–(n), (s).

33. Mr. Johnson himself admitted that any work done by the RWG (of which Mr. van Kloberg and his organization, the Washington World Group, were members) had already been "completed" before the execution of the July 22 Letter Agreement. Tr. at 27, 42.

34. Crucially, when asked whether he wrote the July 21, 1994 letter, which became the July 22 Letter Agreement, on behalf of himself, on behalf of the RWG, or on behalf of someone else, Mr. Johnson testified that he "was writing on behalf of my law firm." Tr. at 42. This fact further underscores that the July 22 Letter Agreement did not contemplate any payments to any members of the RWG, such as Mr. van Kloberg and his Washington World Group.

35. The court finds that Mr. Johnson entered the July 22, 1994 Letter Agreement as counsel for the plaintiff. Tr. at 42. As he testified, "I was working on behalf of the government pursuant to the July 22nd contract." Tr. at 167.

36. In terms of the services supposedly involved with closing down the Embassy, Mr. Johnson admitted not only that the Embassy remained open, but also that he never completed or submitted a list of Embassy debts to the Department of State, or took care of Embassy vehicles, insurance policies, addresses, or leases, among other things. Tr. at 145–48. Mr. Johnson also spent less than half an hour in oversight of the return of license plates, tax identification cards, credentials, etc., since Mr. Uwimana had already taken care of those tasks on his own. Tr. at 148.

37. The court concludes that the overwhelming majority of work that Mr. Johnson performed under the July 22 Letter Agreement, for which he wrote himself a $10,000 check, was on behalf of Mr. Uwimana personally and initially, for Mr. Karani and Mr. Rwakazina, personally in their quests to seek asylum. The court con-

cludes that only a minuscule portion of the $55,000, if any, actually might have benefited the Government of Rwanda, and that these activities were never requested by the Republic. Ex. 23.

38. The RWG had little, if any, role in performing the services under the July 22 Letter Agreement. Indeed, the absence of any payments to Mr. Towell or his Foreign Policy Group undercuts any argument by Mr. Johnson that the July 22 Letter Agreement involved the RWG. Ex. 23. After all, if this contract had involved the RWG, logic dictates that each of the RWG's three members would receive at least one payment under the contract, as had occurred with the July 8 MOU. Ex. 22.

39. Moreover, even assuming for the moment that the Washington World Group did perform services pursuant to the July 22 Letter Agreement—and the court finds it did extremely little and nothing that *the Republic* had requested—Mr. van Kloberg himself testified that any work that he would have done after July 22 would have been of a private nature and for Mr. Uwimana's personal benefit, rather than work for the Government of Rwanda. Tr. at 79–80. If Mr. van Kloberg, who is not an attorney, understood this concept, it defies reason to think that Mr. Johnson, who is an attorney, did not. Once again, the record undermines Mr. Johnson's probity.

40. Mr. van Kloberg testified that he understood clearly that once Mr. Uwimana left the Embassy on July 22, he was no longer Ambassador. When asked his understanding of the Note Verbale issued by the Department of State on Mr. Uwimana's status as Ambassador, Mr. van Kloberg said of Mr. Uwimana, "After he left his building, turned in his keys, et cetera, he was no longer Ambassador." Tr. at 79. In addition, Mr. van Kloberg was able to clearly distinguish that after July 22, any

visits he had with Mr. Uwimana were "private visits" rather than work on behalf of the Government of Rwanda. Tr. at 79–80.

41. Perhaps most importantly, Mr. Uwimana himself understood unequivocally that the United States did not recognize him as the Ambassador on July 23. Tr. at 114.

42. Indeed, the only person who seems not to have understood that Mr. Uwimana no longer possessed the powers of Ambassador was Mr. Johnson. His assertion that in August 1994 "the government of the United States still recognized the interim government" is totally unsupported by the record. Tr. at 231.

43. At trial, Mr. Johnson visibly strained in his attempt to convince the court that Mr. Uwimana still possessed some powers of an Ambassador after July 22 and into August. Despite the July 15 Note Verbale's unmistakably ordering Mr. Uwimana to leave his post and to leave the country by July 22, 1994, Mr. Johnson's testimony maintained that Mr. Uwimana retained residual ambassadorial authority. This position is a blatant departure from the truth of the matter. The following exchange between counsel for the Republic and Mr. Johnson illustrates the point:

Q: You understood that Mr. Uwimana was still recognized as the Ambassador of [the interim] government after July 22nd?

A: He was not the accredited Ambassador to the United States. He was allowed to stay in [the] United States. An Ambassador has residual powers for a period of time and this is what I knew existed. I knew what powers an Ambassador has when he is extraordinary and plenipotentiary. I know an Ambassador has residual powers to still bind his government.

. . . . .

Q: Hadn't the State Department by July 22nd de-recognize[d] Mr. Uwimana as the Ambassador of Rwanda to [the] United States?

A: I don't know what you mean by the term "de-recognize" the Ambassador.

Q: They required him to turn in his credentials and he was no longer recognized as the Ambassador of Rwanda.

A: No. They required him to turn in his credentials. He was no longer recognize[d] as the Ambassador extraordinary and plenipotentiary to the United States. He was still recognized as an Ambassador by his government. It just affected the extent of [his] powers.

Tr. at 231–32.

44. Mr. Johnson acknowledged that he never contacted anyone at the Department of State to ascertain whether the United States still recognized Mr. Uwimana as Ambassador after July 22 and what, if any, "residual powers" Mr. Uwimana might have retained. Tr. at 233. Mr. Johnson's defense that "[n]o one ever told me he was not recognized as Ambassador" is appallingly weak. Tr. at 233. Mr. Johnson seems to believe that the Department of State had some type of affirmative obligation to inform him personally that the United States had "de-recognized" Mr. Uwimana as Ambassador and that he, in turn, had no obligation as a lawyer to affirmatively take steps to verify the status of Mr. Uwimana as part of his due diligence.

45. Mr. Johnson testified that he never contacted the Department of State to verify Mr. Uwimana's status after July 22 and never saw Mr. Uwimana at the Rwandan Embassy after that date. Tr. at 233–34. In addition, Mr. Johnson admits he was most likely well aware of the Department of State's July 15 Note Verbale either that day or by the next day. Tr. at 33. Thus,

he was well aware of the Note Verbale's directive that Mr. Uwimana "will be required to depart the United States no later than July 22, 1994." Ex. 27.

46. In sum, the court finds Mr. Johnson's testimony on these points to be evasive, vague, misleading, totally unsupported by the record, and consequently lacking credibility. In defense of his actions (or his omissions), Mr. Johnson relied on his own unique interpretation of the powers of Ambassador, despite the very clear statement of Mr. Uwimana's status as Ambassador by the Department of State in its July 15 Note Verbale. Ex. 27. He never makes clear what "residual powers" an unaccredited Ambassador might have. Tr. at 232. Rather, Mr. Johnson engages in testimonial aikido to try to justify his course of conduct.

### D. Possible Ratification?

47. On August 26, 1994, Mr. Johnson wrote a memorandum to his file reporting on a conversation he had had with the Office of Protocol at the Department of State about the Rwandan Embassy. Ex. 19. His memorandum explained that the United States had already recognized the RPF as the ruling government and that Mr. Karani had been appointed as Chargé Ad Interim of Rwanda in Washington. Ex. 19. Mr. Johnson's memorandum also noted that "Mr. Karani retained his diplomatic status, but the other diplomats lost theirs on August 14." Ex. 19.

48. Significantly, Mr. Johnson's August 26 memorandum to his file also said, "[r]egarding Ambassador Uwimana, his diplomatic status was revoked on July 22, and his family was given an additional grace period until August 14." Ex. 19.

49. On September 6, 1994, Mr. Karani wrote to Mr. Johnson specifically requesting the return of the funds that Johnson had set aside for his and Mr. Rwakazina's asylum requests. Ex. 41A. Mr. Johnson refused to return any of these funds. Tr. at 158.

50. Rather than returning any funds to his rightful client, the Government of Rwanda, Mr. Johnson took his instructions from Mr. Uwimana even though he knew for certain by this time that Mr. Uwimana was no longer a legitimate representative of Rwanda while Mr. Karani, who had been reappointed, was Rwanda's legitimate representative who was recognized by the Department of State. Tr. at 152; Ex. 19. Mr. Johnson's August 26 memorandum belies his bald assertion that Mr. Uwimana retained his authority. Ex. 19. His memorandum states explicitly that "Mr. Karani retained his diplomatic status." Ex. 19. His memorandum also explicitly states that "[r]egarding Ambassador Uwimana, his diplomatic status was revoked on July 22...." Ex. 19. Thus, Mr. Johnson's own paper trail makes his insistence on taking instructions only from Mr. Uwimana even more unbelievable.

51. As late as September 15, 1994, Mr. Johnson informed Rwanda that he would take instructions only from Mr. Uwimana, who, in Mr. Johnson's view, had the authority to direct the disposition of Rwandan funds. Ex. 16; Tr. at 153–54.

52. Mr. Uwimana testified that he instructed Mr. Johnson not to return the money after Mr. Karani sent the September 6 letter asking for the return of the money. Tr. at 120–21.

53. But if Mr. Johnson did not think that Mr. Karani had the authority to countermand Mr. Uwimana's orders and that Mr. Karani did not even understand the contract, he could not have believed, as he now claims, that Mr. Karani, on behalf of Rwanda, was somehow ratifying Mr. Uwimana's expenditure of Rwanda's funds on an asylum request. Tr. at 188–99.

54. For some reason, however, Mr. Johnson explained that he had no dispute with Rwanda regarding its funds until November 1994. Tr. at 158. Once again, this confusing statement calls into question Mr. Johnson's credibility.

55. On September 27, 1994, Mr. Uwimana instructed Mr. Johnson that the remaining Rwandan funds in the Robert W. Johnson II Trust Fund should not be returned to Rwanda, but should be applied toward immigration services for Mr. Uwimana and his family. Ex. 17.

56. On October 21, 1994, Mr. Johnson wrote another letter to Rwandan Embassy officials refusing to return the money and stating that he would only take instruction from Mr. Uwimana. Ex. 18.

57. On October 29, 1994, The Washington Post printed a letter to the editor from Mr. Johnson entitled "On His Government's Orders." Ex. 26. The piece begins with Mr. Johnson's saying, "I am writing on behalf of my client Aloys Uwimana in reference to the article 'Rwandan Envoy Missing with Suitcase of Cash' [news story, Oct. 19]." [5] Ex. 26. By declaring that Mr. Uwimana was his client, Mr. Johnson underscores yet again that he viewed Mr. Uwimana as his client, rather than the Government of Rwanda.

58. Moreover, the omissions from Mr. Johnson's letter to The Washington Post speak volumes. The title of the article and most of its content deal with alleged wrongdoing on the part of other Rwandan officials.[6] Ex. 26. But Mr. Johnson's letter only takes issue with statements in "the final two sentences" that concern Mr. Uwimana. Ex. 26. In addition, as quoted in Mr. Johnson's letter to the editor, the article said, "Officials who took over Rwanda's Embassy in Washington from Amb. Aloys Uwimana, a Hutu, discovered that more than $2 million was missing . . . ." Ex. 26. Mr. Johnson continues by defending Mr. Uwimana as follows: "The implication of this is that Mr. Uwimana has engaged in wrongful activity. This is untrue." Ex. 26.

59. Perhaps more than any other document, these statements by Mr. Johnson highlight his state of mind about whom he was representing, namely, Mr. Uwimana. By vigorously defending Mr. Uwimana from what he considered to be "untrue" attacks on him by officials who were then representing the Government of Rwanda and by taking the time to write a letter to the editor to attempt to clear Mr. Uwimana's name, Mr. Johnson's letter to the editor demonstrates in an unassailable manner that he considered his client to be Mr. Uwimana—and not the Republic.

60. Despite the obvious clash of professional loyalties, Mr. Johnson chose to recognize no conflict of interest between Mr. Uwimana, his new client who was the former Rwandan Ambassador to the United States, and the Government of Rwanda, his existing client. Tr. at 166–67.

61. Within weeks after Mr. Johnson's October 21 letter, Joseph Mutaboba, the new Chargé D'Affairs for Rwanda and the highest-ranking official in the Rwandan Embassy at that point, wrote Mr. Johnson on November 14 demanding the return of Rwanda's $55,000. Ex. 21.

---

**5.** The court notes that the headline from the original article was not referring to Mr. Uwimana. Ex. 26.

**6.** The court takes judicial notice of the original article, which ran on October 19, 1994. A court may take judicial notice of matters of a general public nature. *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C.Cir.1993); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C.Cir.1979).

62. Mr. Johnson rejected Mr. Mutaboba's request with a letter dated November 16. Ex. 24.

63. In his November 16 letter, Mr. Johnson wrote, "I no longer possess any funds belonging to the Embassy of Rwanda." Ex. 24. This was not true. As exhibit 23 shows, $551.27 remained in the account at that point. Ex. 23.

64. In addition, the September 6, 1994 letter from Mr. Karani to Mr. Johnson did not serve as ratification of a portion of the $55,000 since Mr. Johnson himself testified that he did not believe Mr. Karani had the authority to direct the payment or disbursement of funds, but that only Mr. Uwimana did.[7] Ex. 41A.

65. In any event, Mr. Karani's September 6 letter would have merely amounted to a partial ratification since it mentioned only $30,000. Ex. 41A. The Karani letter asks for a refund to the Embassy of $17,475. Ex. 41A. Thus, assuming a partial ratification theory applies, Mr. Karani's September 6 letter would have ratified $12,525. In addition, because the letter only mentioned $30,000 and not the other $25,000, even under a ratification theory, there could be no ratification of the other $25,000. Accordingly, even assuming that there was a partial ratification, Mr. Karani's letter would have ratified only $12,525 out of the total $55,000 from the July 22 Letter Agreement.

66. Finally, the September 6 letter could not have constituted a ratification of the $28,000 from the July 8 MOU because neither the $28,000 nor the July 8 MOU is mentioned specifically in the September 6 letter. Ex. 41A. Moreover, the Government of Rwanda would not have realized

until a later point that the lobbying services it paid for in the July 8 MOU never took place. Thus, out of the total $83,000, Mr. Karani's September 6 letter could have ratified no more than $12,525.

### E. Mr. Johnson's Conduct

67. Stepping back for a moment, the court views Mr. Johnson's conduct as misleading, reckless, intentional, and willful. In short, the underlying story seems to have been that Mr. Johnson knew that Mr. Uwimana was going to lose his official authority on July 22 and so, at the eleventh hour, he and Mr. Uwimana agreed that Mr. Uwimana, in one of his last "official acts" as Ambassador, would write a $55,000 check to Mr. Johnson, to be used almost exclusively to help Mr. Uwimana and the other Rwandan officials seek asylum in the United States.

68. These actions clearly were not in the interests of the Republic of Rwanda. From just after the point on July 22 when Mr. Uwimana turned in his credentials and left the Embassy, he was no longer the ambassador. From that moment forward, Mr. Johnson was representing Mr. Uwimana in his personal capacity, and was no longer representing the interests of the Government of Rwanda.

69. The problem, of course, is that his trust fund had been paid $55,000 to perform this representation, which was not at all in the interests of the Republic. Acting in gross and willful disregard of his ethical obligations as a lawyer, Mr. Johnson self-servingly continued using and disbursing the monies from the July 22 Letter Agreement without ever taking any affirmative steps to contradict his own, unsubstantiat-

---

**7.** The court discusses the ratification theory extensively *infra*. In short, though, "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act ... is given effect as if originally authorized by him." *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 672 n. 12 (D.C.1983) (quoting Restatement (Second) of Agency § 82 (1958)).

ed view that Mr. Uwimana still held official power to direct the use of Rwandan funds.

70. Moreover, even under Mr. Johnson's own assertion of ignorance to the fact that Mr. Uwimana had not been stripped of his official powers but had retained residual powers during the month of August, he contradicts himself again with his August 26 memorandum to the file. Ex. 19. In that document, Mr. Johnson explicitly notes that the Department of State had officially recognized the RPF as the Government of Rwanda, that "Mr. Karani retained his diplomatic status," *and* that Ambassador Uwimana's "diplomatic status was revoked on July 22." Ex. 19. At this point, even under Mr. Johnson's strangely unique worldview, Mr. Uwimana possessed no residual power of any kind since he was a Hutu and the opposition Tutsi government was now in power and recognized by the United States. Consequently, after this date, Mr. Johnson's insistence on taking instruction from Mr. Uwimana alone not only lacks justification but also smacks of obvious self-interest since Mr. Uwimana acted as Mr. Johnson's co-collaborator in misappropriating Rwanda's funds.[8]

71. In sum, it is difficult to view this case as anything other than one in which an Ambassador, who is about to be forced out of his post, cuts one final check disbursing government funds to his lawyer with whom he made a special arrangement to provide asylum-related services for the Ambassador's personal benefit.

## IV. CONCLUSIONS OF LAW

Based on the facts thus found as applied to the applicable law, the court concludes that Mr. Johnson is liable for conversion and for breach of fiduciary duty for both the July 8 and the July 22 contracts. In addition, the court concludes that Mr. Johnson's conduct warrants the imposition of punitive damages.

### A. Mr. Johnson is Liable for Conversion

 A defendant will be liable for conversion if the plaintiff shows that the defendant participated in (1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto. *Furash & Co. v. McClave*, 130 F.Supp.2d 48, 58 (D.D.C. 2001); *Equity Group, Ltd. v. Painewebber Inc.*, 839 F.Supp. 930, 933 (D.D.C.1993); *O'Callaghan v. District of Columbia*, 741 F.Supp. 273, 279–80 (D.D.C.1990); *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 158 (D.C.2000).[9] The burden of proof for a conversion claim is a preponderance of the evidence. *R.A. Weaver and Assoc., Inc. v. Haas and Haynie Corp.*, 663 F.2d 168, 172–74 (D.C.Cir.1980); *Kuwait Airways Corp. v. Am. Sec. Bank*, 1987 WL 33448, at *1–2 (D.D.C.1987); *Langley Fed. Credit Union v. Harp*, 471 F.Supp. 565, 574 (D.D.C.1979); *Landise v. Mauro*, 725 A.2d 445, 450 (D.C.1998).

 When the initial possession is lawful, the plaintiff must make a demand for the return of the converted goods to demonstrate the adverse nature of the possession. *Furash & Co.*, 130 F.Supp.2d at 58 (citing *Shea v. Fridley*, 123 A.2d 358, 361 (D.C.1956)). Money can be the sub-

---

8. In the adversary proceeding the Government of Rwanda brought in the bankruptcy case of Mr. Uwimana, the Fourth Circuit affirmed the district court's conclusion that Mr. Uwimana had committed a "defalcation," or embezzlement, of the Republic's funds. *In re Uwimana*, 274 F.3d 806, 808 (4th Cir.2001).

9. The parties and the court all agree that District of Columbia law should apply to this case.

ject of a conversion claim when the plaintiff has the right to a specific identifiable fund of money. *Curaflex Health Serv. v. Bruni*, 877 F.Supp. 30, 32 (D.D.C.1995).

■ In this case, the Republic paid Mr. Johnson $28,000 and $55,000 under the July 8 MOU and the July 22 Letter Agreement respectively. The court has found that none of the lobbying or other work for Rwanda ever took place under the July 8 MOU. In addition, Mr. Johnson used $55,000 from the July 22 Letter Agreement almost exclusively for Mr. Uwimana's asylum request and for other immigration services. These monies were never used in a way that would benefit the Government of Rwanda.

Once the Department of State issued the Note Verbale on July 15, 1994, Mr. Johnson knew or should have known that Mr. Uwimana would lose his powers to represent or to speak for the Government of Rwanda after the close of business on July 22. Mr. Van Kloberg, a non-lawyer, testified that he clearly understood that any work he performed for Mr. Uwimana after July 22 would be for Mr. Uwimana in a personal capacity, rather than for the Government of Rwanda. For Mr. Johnson not to understand this principle demonstrates either that he has a remarkable capacity for self-delusion or that he is not being truthful.

Mr. Johnson accepted the Republic's money for what he knew was Mr. Uwimana's personal interest and against the interests of his client, the Government of Rwanda. A person need not be an expert in international relations to understand the common-sense notion that it is not in a government's interest to have one of its ambassadors choose to seek asylum in another country, whatever the merits of the asylum request might be. Indeed, the court can understand why Mr. Uwimana, a Hutu, would have been afraid to return to

his country when the opposition RPF, led by Tutsis, had come to power after a bloody civil war. But, as the plaintiff's counsel noted in his closing argument, if Mr. Uwimana had used his own money to pursue his asylum request, the plaintiff never would have or could have brought this case.

Despite several requests for the return of the money, Mr. Johnson continued to hold the Republic's funds and failed to give the Republic any consideration for it, against the Republic's express directions. Because the plaintiff has proven by a preponderance of the evidence that Mr. Johnson engaged in an unlawful exercise of ownership, dominion, and control of the monies of the Government of Rwanda, in denial or repudiation of Rwanda's rights thereto, Mr. Johnson is liable for conversion of both the $28,000 under the July 8 MOU and the $55,000 under the July 22 Letter Agreement. *Furash & Co.*, 130 F.Supp.2d at 58; *Flocco*, 752 A.2d at 158; *Shea*, 123 A.2d at 361.

## B. Mr. Johnson is Liable for Breach of Fiduciary Duty

■ An agent is a person who is authorized by a principal to act on her behalf. *Johnson v. Bechtel Assoc. Prof'l Corp.*, 717 F.2d 574, 579 (D.C.Cir.1983), *reversed on other grounds, Washington Metro. Area Transit Auth. v. Johnson*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984). The agent-principal relationship is characterized by two elements: (1) an indication by the principal that the agent will act on her behalf and subject to her control, and (2) a manifestation of the agent's consent to so act. *Id.; Rose v. Silver*, 394 A.2d 1368, 1371 (D.C.1978); Restatement (Second) Agency § 1 (1958). An agent owes her principal a fiduciary duty and a duty of loyalty. *Furash & Co.*, 130 F.Supp.2d at 53; *Multicom, Inc. v. Chesapeake and Potomac Tel. Co.*, 1988 WL

118411, \*4 (D.D.C.1988); *Aronoff v. Lenkin Co.,* 618 A.2d 669, 687 (D.C.1992). A fiduciary relationship exists when one party "is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) Torts § 874 cmt. a (1977). A fiduciary relationship is "founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and betrayed." *Church of Scientology Int'l v. Eli Lilly & Co.,* 848 F.Supp. 1018, 1028 (D.D.C.1994) (internal quotations omitted).

■■■■ Like other agents, lawyers owe their clients a duty of loyalty and a duty of care. *First Am. Corp. v. Al–Nahyan,* 17 F.Supp.2d 10, 27 (D.D.C.1998); *BCCI Holdings v. Clifford,* 964 F.Supp. 468, 481 (D.D.C.1997). Whether an attorney breached his fiduciary duty depends on whether he "put himself or herself in a position by which he or she cannot give full loyalty to which the client is entitled." *Am. Corp.,* 17 F.Supp.2d at 17 (citing *Avianca, Inc. v. Corriea,* 705 F.Supp. 666, 679 (D.D.C.1989) (explaining that a corporate attorney's client is the corporate entity, not the individual officers or directors)). The fiduciary duties owed by an attorney to a client extend to all matters in which the attorney is involved, not simply the ones in which he is expressly retained as legal counsel and receives legal fees. *Avianca,* 705 F.Supp. at 680. In addition, "[u]nless the clients consent after full disclosure, the duty of undivided loyalty is breached where a lawyer represents clients with conflicting interests." *BCCI Holdings (Luxembourg), S.A.,* 964 F.Supp. at 481. Moreover, when the loyalty to the client is questioned, the burden rests on the attorney to make a full, affirmative disclosure. *Id.* To recover on a claim for breach of fiduciary duty, the plaintiff must prove by a preponderance of the evidence that a fiduciary duty existed between the parties, that the defendant violated that fiduciary obligation, and that the plaintiff suffered damages as a proximate result of the violation. *Landise,* 725 A.2d at 450; 3 Fed. Jury Prac. & Instr. § 123.02 (5th ed.).

■■■■ By signing the July 8 and the July 22 contracts and accepting Rwandan funds in exchange for "lobbying services" for the benefit of the Government of Rwanda, Mr. Johnson was agreeing to act as the Government of Rwanda's agent. *Johnson,* 717 F.2d at 579. Accordingly, as Rwanda's agent and as an attorney, Johnson owed Rwanda a fiduciary duty and a duty of loyalty. *Am. Corp.,* 17 F.Supp.2d at 27.

■■■■ In this case, Mr. Johnson plainly breached his fiduciary duty to his client, the Government of Rwanda, under both the July 8 MOU and the July 22 Letter Agreement. Under the July 8 MOU, Mr. Johnson breached his fiduciary duty and duty of loyalty to the Republic by failing to perform any of the lobbying-related tasks outlined in the July 8 MOU.

■■■■ While Mr. Johnson committed the same breach under the July 22 Letter Agreement, he committed an even more egregious breach of his fiduciary duty when the interests of his client, the Government of Rwanda, and Mr. Uwimana began to diverge. After July 22, when the Department of State forced out Mr. Uwimana as Ambassador, Mr. Johnson had an immediate duty to freeze and to refrain from spending any of Rwanda's money until he inquired, determined, and verified that there was no conflict of interest between Mr. Uwimana and the Government of Rwanda. By failing to do so, Mr. Johnson violated D.C. Rule of Professional Conduct 1.7, which states, in pertinent part:

(a) A lawyer shall not advance two or more adverse positions in the same matter.

(b) ... a lawyer shall not represent a client with respect to a matter if: ...

(3) Representation of another client will be or is likely to be adversely affected by such representation; or

(4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

D.C. Rule of Professional Conduct 1.7. A lawyer may only represent two potentially adverse clients if "each potentially affected client provides consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation." D.C. Rule of Professional Conduct 1.7. Not only did Mr. Johnson fail to attempt to contact his client—the Government of Rwanda—in this matter, he also failed to disclose to his client his potentially adverse position in helping Mr. Uwimana seek asylum from the very government that Mr. Johnson was representing and from which he was receiving funds. Mr. Johnson thus blatantly violated D.C. Rule of Professional Conduct 1.7.

By agreeing to help Mr. Uwimana seek asylum and then by taking steps to help him gain asylum, Mr. Johnson was acting against the interests of his client. At this point, Mr. Johnson breached his fiduciary duty by putting "himself ... in a position by which he ... cannot give full loyalty to which the client is entitled." *Am. Corp.,* 17 F.Supp.2d at 27; *Avianca, Inc.,* 705 F.Supp. at 679. The court determines that Mr. Johnson could not possibly have given full loyalty to his client, the Government of Rwanda, when he was actively attempting

to win asylum for Mr. Uwimana, a former official of the Government of Rwanda. *BCCI Holdings,* 964 F.Supp. at 481. As such, the Republic clearly suffered damages as a proximate result of Mr. Johnson's breach of his fiduciary duty since the Republic did not receive any benefit that it had requested under the July 22 Letter Agreement in return for its $55,000. 3 Fed. Jury Prac. & Instr. § 123.02 (5th ed.).

Despite his protestations to the contrary, Mr. Johnson's words and deeds make clear that he considered his client to be Uwimana, and not the Government of Rwanda. Among other things, Mr. Johnson refused to return money to his client despite his client's request, he insisted on taking instruction only from Mr. Uwimana because that was a more convenient approach for Mr. Johnson financially, and he publicly made clear in his letter to the editor in The Washington Post that his allegiance was to his new client, Mr. Uwimana, rather than to the Government of Rwanda. By conducting himself in this manner, Mr. Johnson blatantly violated the duty of loyalty he owed as an attorney to his true client, the Government of Rwanda. *Am. Corp.,* 17 F.Supp.2d at 27.

Moreover, Mr. Johnson cannot credibly contend that after July 22, the funds belonged to Mr. Uwimana's interim government. "A change in a government's leadership works no change in the national sovereignty or its right." *Republic of Liberia v. Bickford,* 787 F.Supp. 397, 401 (S.D.N.Y.1992); *Lehigh Valley R. Co. v. State of Russia,* 21 F.2d 396, 401 (2d Cir. 1927). The principal is similar to the one enunciated in *Avianca,* whereby the court held that a corporate attorney's client is the corporate entity, not the individual representative officers or directors. *Avianca,* 705 F.Supp. at 679. Likewise, merely because the leadership of Rwanda changed does not mean that Mr. Johnson

should have continued taking his marching orders from former officials of the Government of Rwanda. *Republic of Liberia*, 787 F.Supp. at 401; *Lehigh Valley R. Co.*, 21 F.2d at 401.

If Mr. Johnson had wanted to serve as Mr. Uwimana's attorney after July 22, he should have, at minimum, immediately returned to the Government of Rwanda the $55,000 paid to him under the July 22 Letter Agreement, explained in writing to the Government of Rwanda that he would no longer represent it, worked out an agreement with Mr. Uwimana for Mr. Uwimana himself to pay Mr. Johnson's attorney's fees (or for Mr. Johnson to perform these services pro bono), and taken any other steps required by the D.C. Rules of Professional Conduct. Mr. Johnson, however, did none of these things. As such, his actions and omissions constitute a blatant breach of his fiduciary duty to his client. The plaintiff has easily proven its case of a breach of fiduciary duty by a preponderance of the evidence. *Landise*, 725 A.2d at 450.

In sum, the court concludes that the plaintiff has proven its case that Mr. Johnson is liable for conversion and breach of fiduciary duty under both the July 8 MOU and the July 22 Letter Agreement. Accordingly, the court orders Mr. Johnson to pay the Government of Rwanda the remaining unrecovered $1,800 pursuant to the July 8 MOU and the $55,000 pursuant to the July 22 Letter Agreement.

## C. Mr. Uwimana Did Not Have Apparent Authority to Use the Republic's Funds for His Personal Asylum Request

In his defense, Mr. Johnson argues that Mr. Uwimana had apparent authority as an agent of the Government of Rwanda and thus that Mr. Uwimana could properly use Rwandan funds for his personal asylum request. Def.'s Post–Trial Brief at 8.

Stunningly, Mr. Johnson also contends that he could reasonably continue to believe that Mr. Uwimana retained this apparent authority even after Mr. Johnson received the September 6, 1994 letter from Mr. Karani, written on Rwandan Embassy stationery, demanding that Mr. Johnson return money to the Government of Rwanda. *Id.*

 Under District of Columbia law, a principal is bound by the acts of its agent only when the agent acts with either actual or apparent authority. *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi, Ltd.*, 15 F.Supp.2d 1, 7 (D.D.C.1997). Actual authority can be manifested either expressly or impliedly. *Id.* at 7 n. 7. For example, a corporation can give an agent actual authority expressly through its by-laws or by making the grant of authority clear in a separate board action. *Id.* To be implied, the authority must go hand in hand with other express, actual authority. *Id.* Meanwhile, apparent authority for an agent to do an act "is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency § 27 (1958); *see also Am. Bankers Ins. Co. v. United States*, 596 A.2d 598, 602 (D.C.1991). The D.C. Court of Appeals has explained that "[t]his falls short of an overt, affirmative representation by a principal." *Ins. Mgt. of Washington, Inc. v. Eno & Howard Plumbing Corp.*, 348 A.2d 310, 312 (D.C. 1975). Lastly, apparent authority exists "only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized" and to "believe the agent to be authorized." *Id.* Accordingly, District of Columbia law

imposes both an objective and subjective standard. *Columbia Hosp. for Women Found., Inc.*, 15 F.Supp.2d at 8.

 In this case, Mr. Johnson argues that he, as a third person, could reasonably believe that Mr. Uwimana, an agent, had apparent authority to bind the government of Rwanda, the principal, both by the July 22 Letter Agreement and well after the close of business on July 22, 1994, the point at which he ceased being the Rwandan Ambassador to the United States and was forced by the U.S. Department of State to turn in his credentials.[10] Def.'s Post–Trial Brief at 14–17. Before July 22, 1994, Mr. Uwimana may have had actual authority to contract on behalf of Rwanda, but he never possessed the authority to use government money for his own personal asylum request. *In re Uwimana*, 274 F.3d at 812 (holding that, in light of the Vienna convention and basic principles of agency law, "Uwimana plainly breached his duty to Rwanda" because he used funds for his personal benefit without disclosing his acts to the Republic). After July 22, 1994, Mr. Uwimana clearly did not possess actual authority, either express or implied, to bind the Government of Rwanda. Acknowledging how far-fetched such an argument would be, the defendant seems to concede this point, focusing on the apparent-authority argument. Def.'s Post–Trial Brief at 13. After all, at no time after July 22 did any official who was still recognized by the United States, such as Mr. Karani, write a letter or make clear by some other action that Mr. Uwimana

still had the power to bind the Government of Rwanda. *Columbia Hosp. for Women Found., Inc.*, 15 F.Supp.2d at 7, n. 7. Mr. Johnson fails to point to anything in the record that shows that Mr. Uwimana acted with actual authority.

The question then becomes whether the Government of Rwanda "place[d] an agent (Mr. Uwimana) in a position which cause[d] a third person (Mr. Johnson) to reasonably believe that the principal (the government of Rwanda) consented to the exercise of authority the agent (Mr. Uwimana) purports to hold." *Am. Bankers Ins. Co.*, 596 A.2d at 602. The answer is a resounding no. The court wholeheartedly agrees with the Fourth Circuit's conclusion that Mr. Uwimana used funds belonging to the Republic to seek asylum for himself and his family "without disclosing his act to the government of the state he represented or seeking its consent." *In re Uwimana*, 274 F.3d at 812. Once again, while Mr. Uwimana may have had actual authority to contract on Rwanda's behalf while he was Ambassador, he certainly never had the authority to use the Republic's money to seek asylum from the Republic itself. *See id.* Nothing in the record demonstrates that a third person could reasonably believe that the Republic would have consented either to the July 22 Letter Agreement, by which Mr. Uwimana used the Republic's funds to pursue an objective antithetical to the Republic's own objectives, or to Mr. Uwimana's speaking on behalf of the Government of Rwanda after

---

10. On a separate note, the defendant declares that the doctrine of the separation of powers prevents the court from determining which regime constituted the legitimate Government of Rwanda during the relevant period in 1994 because this determination is "the sole and exclusive preserve of the Executive Branch." Def.'s Post–Trial Brief at 14. This perplexing statement amounts to a red herring. Throughout this decision, the court has never attempted to offer its own interpretation of which regime constituted the legitimate Government of Rwanda. Rather, the court has relied on the Note Verbale from the United States Department of State, an arm of the executive branch, to articulate when the United States would no longer recognize Mr. Uwimana as the Rwandan Ambassador. Accordingly, the defendant's separation-of-powers argument is merely a smokescreen.

July 22. *Am. Bankers Ins. Co.*, 596 A.2d at 602.

To wit, the Department of State's Note Verbale underscored that it would no longer recognize Mr. Uwimana as Ambassador after July 22, 1994 and ordered him to leave the country by that date. In addition, Mr. Johnson never took any steps to determine the extent of Mr. Uwimana's authority, relying instead on his own self-serving interpretation of international law. Moreover, Mr. Johnson's own August 26 memorandum to his file states: "[r]egarding Ambassador Uwimana, his diplomatic status was revoked on July 22." In contrast, Mr. Johnson's August 26 memorandum also says that "Mr. Karani retained his diplomatic status . . . ." Finally, Mr. Johnson's repeated assertions both in contemporaneous letters and at trial that even after he received Mr. Karani's September 6 letter (written on Embassy letterhead) demanding a return of funds, he still could have reasonably believed that Mr. Uwimana had apparent authority to speak for the Government of Rwanda is totally bogus. In sum, the record in this case establishes clearly that no reasonable third person could have believed that Mr. Uwimana had apparent authority to bind the Government of Rwanda to the July 22 Letter Agreement or to speak for and to bind the Republic after July 22, 1994.

### D. The Republic Did Not Ratify Any of Mr. Uwimana's Decisions

The court rejects Mr. Johnson's argument that the Government of Rwanda, through Mr. Karani, ratified Mr. Johnson's conversion under either contract. Before turning to the issue of ratification, however, the court addresses the effect of the Fourth Circuit's opinion in *In re Uwimana*, a bankruptcy case involving the Government of Rwanda and Mr. Uwimana. 274 F.3d 806. The Fourth Circuit concluded that through Mr. Karani's September 6,

1994 letter to Mr. Johnson, Rwanda ratified all but $17,475 of the $55,000. *In re Uwimana*, 274 F.3d at 812–13.

The first question that arises is whether the Fourth Circuit's decision is res judicata in this case. The court concludes that it is not. Res judicata bars a claim when there has been a final judgment on the merits in a prior suit involving the same parties or their privies and the same cause of action. *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946–47 (D.C.Cir.1983). A nonparty may be considered in privity with a party to the prior action if the nonparty's interests are "adequately represented by a party to the original action" *Am. Forest Res. Council v. Shea*, 172 F.Supp.2d 24, 31 (D.D.C.2001) (internal quotation omitted).

The Fourth Circuit case concerned a bankruptcy proceeding involving Mr. Uwimana. *In re Uwimana*, 274 F.3d 806. Because Mr. Johnson was not a party to that proceeding, the doctrine of res judicata does not apply. *I.A.M. Nat'l Pension Fund*, 723 F.2d at 946–47. Mr. Johnson himself acknowledges that he was not a party in that action. Def.'s Post–Trial Brief at 13. Moreover, res judicata does not apply because the Fourth Circuit case did not involve the same cause of action since the Republic brought no claim for conversion and since Mr. Johnson's conduct was not directly at issue. *Id.; Uwimana*, 274 F.3d 806. Mr. Johnson also could not claim that he was in privity with Mr. Uwimana because Mr. Uwimana could not have adequately represented Mr. Johnson's interests in the bankruptcy proceedings. In that forum, the inquiry into Mr. Uwimana's behavior focused on his "defalcation," or embezzlement of Rwanda's funds, but did not examine the entirely separate question of Mr. Johnson's alleged misappropriation of Rwanda's funds, his alleged conversion, or his alleged

breach of fiduciary duty either as an agent or as a lawyer for the Government of Rwanda. *Am. Forest Res. Council*, 172 F.Supp.2d at 31. Accordingly, the Fourth Circuit's opinion is not res judicata for the instant case.[11]

▮▮▮▮▮▮ The court now turns to the issue of ratification. "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act ... is given effect as if originally authorized by him." *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 672 n. 12 (D.C.1983) (quoting Restatement (Second) of Agency § 82 (1958)). "The crucial inquiry in determining whether an act was subsequently ratified concerns the *intention* of the party allegedly ratifying the act. Although the intention to ratify can be inferred from the totality of the circumstances in each case, the courts hesitate to find ratification where the facts allegedly showing ratification can be easily explained on other grounds." *G & R Corp. v. Am. Sec. & Trust Co.*, 523 F.2d 1164, 1171 (D.C.Cir.1975). The D.C. Circuit has instructed that "[t]he question of ratification is one of fact." *Kuwait Airways Corp. v. Am. Sec. Bank*, 890 F.2d 456, 465 (D.C.Cir.1989). As the D.C. Circuit explained, the District of Columbia Court of Appeals has articulated "an even more exacting standard for finding ratification: For an unauthorized act to be ratified, the principal must have knowledge of the act that may ratify the act impliedly, but the conduct which implies ratification must be conduct which is 'inconsistent with any other hypothesis.'" *Id.* (quoting *Lewis*, 463 A.2d at 671–72).

▮▮▮▮ The question in this case centers on whether Mr. Karani's September 6,

1994 letter to Mr. Johnson constitutes a partial ratification of the $83,000 disbursed to Mr. Johnson through the two contracts. Ex. 41A. In its findings of fact, this court concluded that Mr. Karani's letter did not rise to the level of a ratification. *Kuwait Airways Corp.*, 890 F.2d at 465 ("The question of ratification is one of fact."). The court focuses on Mr. Karani's contemporaneous intent and understanding of what he was supposedly ratifying. *G & R Corp.*, 523 F.2d at 1171. On this point, Mr. Johnson's own testimony illustrates that Mr. Karani did not understand the terms of the July 22 Letter Agreement:

Q: So if Uwimana had the authority to interpret the contract, you would also agree that Karani did not have authority to interpret the contract, is that right?

A: *Charge Karani obviously had no understanding of what the contract was about* because he had, by his September 6th letter he had asked for a return of money that had been initially prepared as a budget estimate for his asylum requests. *He did not understand that we had already done most of the legal work* for his asylum requests, for Ambassador Uwimana's asylum requests and First Secretary Rwakazina's asylum requests way in advance before he wanted the refund of the money. *So he obviously [was] operating under a mistake of fact and of what the contract called for.*

Q: I thought Karani was a key player in the formation of the contract because he signed a check for $55,000, isn't that right?

A: He signed the check.

Q: But he did not understand what the contract was about when he signed the check on July 22nd?

---

11. While the Fourth Circuit's opinion in this case is not res judicata, the court still accords great weight to the Fourth Circuit's conclu-

sion that Mr. Uwimana defalcated monies from the Government of Rwanda. *Uwimana,* 274 F.3d at 811–12.

A: He was the consular. *He probably read the contract but he was not privy to discussions about it, what was intended by the contract. I do not know if Ambassador Uwimana showed him the other memos about the contract.* Tr. at 155–56 (emphasis added). Certainly, Mr. Karani could not have ratified something that, even Mr. Johnson agreed, he did not understand.

In addition, by making it clear through his words and deeds that he did not believe Mr. Karani had the actual authority to direct the disbursement of the monies and that he would rely on Mr. Uwimana for instructions, Mr. Johnson precludes himself from trying to argue that Mr. Karani had the actual authority to ratify certain expenditures. As the D.C. Circuit has explained in a principal-agent case involving the doctrine of estoppel, a third party (in this case, Mr. Johnson) cannot avail himself of estoppel if he actually knew that the agent (Mr. Karani) purporting to represent the principal (the Government of Rwanda) lacked actual authority. *Williams v. Washington Metro. Area Transit Auth.*, 721 F.2d 1412, 1416 n. 7 (D.C.Cir.1983); *Columbia Hosp. for Women Found.*, 15 F.Supp.2d at 8. Mr. Johnson can hardly assert in one breath that Mr. Uwimana—and not Mr. Karani— had the authority to speak for the Government of Rwanda but then assert in the next breath that Mr. Karani had the authority to ratify certain expenditures. Despite his arguments now to the contrary, Mr. Johnson's contemporaneous actions and his own testimony make quite clear that he did not believe Mr. Karani had the authority to ratify any expenditures. He answered only to Mr. Uwimana.

Furthermore, principal-agent law dictates that even assuming Mr. Karani could ratify the expenditures, he could only authorize actions that were intended to benefit the Government of Rwanda. *United States v. Brennan*, 994 F.2d 918 (1st Cir.1993) (holding that ratification by the bank's board does not per se exonerate an officer from willful misapplication of the bank's funds); *United States v. Salinas*, 654 F.2d 319, 328 (5th Cir.1981) (explaining that a bank's board of directors cannot consent in order to "vitiate a fraud on the bank"), *overruled on other grounds, United States v. Adamson*, 700 F.2d 953, 965 (5th Cir.1983); *Simpson v. United States*, 229 F. 940, 945 (9th Cir.1916) (stating that the doctrine of ratification does not apply to an unlawful conversion because "[t]he criminal act was complete when the certificate of deposit was issued without authority from the directors, and with intent to injure and defraud the association, and no act of the directors could change its character."); *United States v. Breese*, 173 F. 402, 408–10 (C.C.W.D.N.C.1909) ("The most formal vote of the board of directors could not authorize the embezzlement, abstraction, or willful misapplication of the funds of the bank."), *aff'd* 203 F. 824 (4th Cir.1913). Because Mr. Johnson improperly converted the Republic's monies, providing no benefit to the Republic, Mr. Karani would not have even had the power to authorize an *ultra vires* act. *Id.*

Finally, as noted in the findings of fact, even assuming *arguendo* that Mr. Karani's September 6 letter constituted a partial ratification, it would have only ratified $12,525. Mr. Karani's letter only mentions $30,000, and not the other $25,000 that makes up the $55,000 July 22 Letter Agreement. Ex. 41A. Mr. Karani asked for a refund to the Embassy of $17,475. Ex. 41A. Because the letter only mentions $30,000 and not the other $25,000, even under a ratification theory, there could be no ratification of the other $25,000 since the letter did not mention the additional $25,000 or the total of

$55,000. The D.C. Court of Appeals has instructed that courts should find ratification only when the conduct at hand is "inconsistent with any other hypothesis." *Lewis*, 463 A.2d at 671–72. Because Mr. Karani's letter fails to mention any amounts of money beyond $30,000, the court can hardly infer that Mr. Karani had contemplated the entire $55,000. Accordingly, even assuming for the moment that there was a partial ratification, Mr. Karani's letter would only have ratified $12,525 out of the total $55,000 July 22 Letter Agreement.

For the same reasons, the September 6 letter does not constitute a ratification of the $28,000 from the July 8 MOU because the $28,000 is not mentioned specifically in the September 6 letter. *Id.;* Ex. 41A. Moreover, the Government of Rwanda would not have realized until a later point that the lobbying services it paid for in the July 8 MOU never took place.

Thus, even assuming *arguendo* that Mr. Karani's September 6 letter constituted a partial ratification, only $12,525 at most could have been ratified out of the total $83,000. Having said that, for the reasons set forth above, the court determines that Mr. Karani's letter did not constitute a partial ratification.

### E. Punitive Damages

 Under District of Columbia law, a defendant may be liable for punitive damages in a conversion action if the defendant's act is "accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Mason v. Rostad,* 476 A.2d 662, 667 (D.C.1984) (internal citations omitted). The same punitive damages standard applies to a breach of fiduciary duty. *Hendry v. Pelland,* 73 F.3d 397, 400 (D.C.Cir.1996); *Wagman v. Lee,* 457 A.2d 401, 405 (D.C.1983); *see also*

*Material Supply Int'l, Inc. v. Sunmatch Indus. Co.,* 146 F.3d 983, 993–94 (D.C.Cir. 1998) (affirming a jury award of punitive damages for breach of fiduciary duty); *Dalo v. Kivitz,* 596 A.2d 35, 40, n. 15 (D.C.1991). A plaintiff must prove that the defendant's acts warrant the imposition of punitive damages by a preponderance of the evidence. *Dalo,* 596 A.2d at 41. In *Wagman,* for example, the District of Columbia Court of Appeals affirmed a punitive damages award against an attorney who, serving as an escrow agent, used a client's $4,000 deposit to help another client purchase a house in which the first client had lived and had substantially made improvements. *Wagman,* 457 A.2d at 405. Because the attorney had used one client's funds to benefit another, the court relied on long-standing precedent in holding that the attorney's actions warranted the imposition of punitive damages. *Id.* (quoting *Brown v. Coates,* 253 F.2d 36, 40 (D.C.Cir. 1958)). In *Brown,* the D.C. Circuit explained that:

> once it has been shown that one trained and experienced holds himself out to the public as worthy to be trusted for hire to perform services for others, and those so invited do place their trust and confidence, and that trust is intentionally and consciously disregarded, and exploited for unwarranted gain, community protection, as well as that of the victim, warrants the imposition of punitive damages.

*Brown,* 253 F.2d at 40.

The Supreme Court has upheld an award of punitive damages that equaled four times the amount of the compensatory damages. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *see also Material Supply Int'l, Inc. v. Sunmatch Indus. Co.,* 146 F.3d 983, 994 (D.C.Cir.1998). On the other hand, the Court has struck down an

award of 500 times the amount of the compensatory damages as constitutionally excessive. *BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d. 809 (1996); *see also Material Supply Int'l, Inc.,* 146 F.3d at 994.

 In this case, the court has already ruled that the defendant has committed an act of conversion and has breached his fiduciary duty to the plaintiff. The question thus becomes whether Mr. Johnson's conduct rose to the level of recklessness or demonstrated a willful disregard of the Republic's rights. *Mason,* 476 A.2d at 667. The court decides that Mr. Johnson's conduct warrants the imposition of punitive damages.

As the court's findings of fact make strikingly clear, Mr. Johnson's actions in this case were accompanied by gross recklessness and a willful disregard of the rights of his rightful client—the Government of Rwanda. *Id.* Among other things, Mr. Johnson failed to produce the services called for under the contracts, represented former Ambassador Uwimana's interests in blatant conflict [12] with the interests of the Government of Rwanda, and insisted that Mr. Uwimana still possessed the power to bind the Government of Rwanda long after it became remarkably obvious that Mr. Uwimana had no such power. The court determines that the Government of Rwanda's "trust [was] intentionally and consciously disregarded, and exploited for unwarranted gain," and accordingly, "community protection, as well as that of the victim, warrants the imposition of punitive damages." *Brown,* 253 F.2d at 40. Moreover, by awarding punitive damages, the court seeks to deter this defendant and other agents who may be similarly situated in the future from committing the gross

lapses in ethics like those that occurred in this case. Accordingly, the court rules that the plaintiff has easily proven by a preponderance of the evidence that defendant Johnson's acts warrant the imposition of punitive damages. *Dalo,* 596 A.2d at 41. Mr. Johnson shall pay $10,000 in punitive damages to the plaintiff.

### F. The Court's Judgment

The court enters a final judgment that defendant Johnson must pay the plaintiff $1,800 on the July 8 MOU and $55,000 on the July 22 Letter Agreement. Defendant Johnson must also pay the plaintiff $10,000 in punitive damages. The court refers the issue concerning the award of attorneys' fees, expenses, and costs to Magistrate Judge Kay for a report and recommendation. The court also refers the issue of whether the imposition of prejudgment interest is warranted in this case to the Magistrate Judge. The court directs the parties to file their briefs on these issues by October 1, 2002. The court also requests that the Magistrate Judge's report and recommendation be submitted by December 1, 2002.

### V. CONCLUSION

For all these reasons, the court rules that defendant Johnson is liable for conversion and breach of fiduciary duty for both the July 8 MOU and the July 22 Letter Agreement. In addition, the court rules for the plaintiff on the issue of punitive damages. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 21 day of August, 2002.

---

12. The circumstances of the representation of Mr. Uwimana were so apparent that Mr. van Kloberg, a non-lawyer, understood instantly that any work he did for Mr. Uwimana after the latter turned in his credentials was for Mr. Uwimana's personal benefit.

## *ORDER*

RULING FOR THE PLAINTIFF ON THE ISSUE OF CONVERSION; RULING FOR THE PLAINTIFF ON THE ISSUE OF BREACH OF FIDUCIARY DUTY; RULING FOR THE PLAINTIFF ON THE ISSUE OF PUNITIVE DAMAGES

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this _____ day of August, 2002, it is

**ORDERED** that defendant Robert W. Johnson II shall pay the plaintiff the balance of the $28,000 under the July 8, 1994 MOU ($1,800); and it is

**FURTHER ORDERED** that defendant Robert W. Johnson II shall pay the plaintiff $55,000 under the July 22, 1994 Letter Agreement; and it is

**ORDERED** that defendant Robert W. Johnson shall pay the plaintiff $10,000 in punitive damages; and it is

**FURTHER ORDERED** that the issue concerning the award of attorneys' fees, expenses, and costs is referred to Magistrate Judge Kay for a report and recommendation. The court also refers the issue of whether the imposition of prejudgment interest is warranted in this case to the Magistrate Judge. The court directs the parties to file their briefs on these issues by October 1, 2002. The court also requests that the Magistrate Judge's report and recommendation be submitted by December 1, 2002.

**SO ORDERED.**